STATE

v.

Tracey BARROS.

No. 2008–292–C.A.

Supreme Court of Rhode Island.

July 8, 2011.

Lauren S. Zurier, Department of Attorney General, for State.

Michael DiLauro, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice ROBINSON for the Court.

The defendant, Tracey Barros, appeals from his conviction, after a jury trial in the Superior Court for Providence County, of the following offenses: conspiracy to commit murder; first-degree murder; discharging a firearm while committing a crime of violence; and unlawfully carrying a firearm without a license.

On appeal, defendant contends that the trial justice committed reversible error (1) when he denied defendant's motion to suppress his confession [1] and (2) when he pre-

---

1. In arguing that defendant's confession should have been suppressed, defendant and the *amici curiae* devote a great deal of attention to the subject of the electronic recording of police interrogations. We shall address that issue in due course.

We are grateful to the following organizations and attorneys for the thoughtful and

cluded cross-examination of a prosecution witness with respect to purported third-party-perpetrator evidence.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel[2]

### A

#### The Murder of Deivy Felipe

On April 27, 2005, at approximately 1:30 a.m., the dead body of one Deivy Felipe was discovered in the driver's seat of a sport utility vehicle (SUV) parked on Althea Street in Providence; it appeared that the decedent had suffered multiple gunshot wounds. When the SUV was processed, detectives from the Bureau of Criminal Identification (BCI) found only smudges, rather than complete fingerprints, on the exterior of the vehicle.[3] Inside the SUV, detectives were able to locate a single fingerprint on a drinking glass; but they were unable to determine whose fingerprint it was. An autopsy revealed that Mr. Felipe had died as a result of bleeding from multiple wounds caused by five gunshots. The lead detective assigned to the Felipe homicide investigation was Providence Police Detective Daniel

O'Connell. He testified at trial[4] that the police were not able to locate any eyewitnesses to the murder and that his team was unable to develop a list of persons whom they might consider to be suspects.

### B

#### The Arrest of Tracey Barros; His Motion to Suppress; His Trial

At approximately 11:30 p.m. on December 29, 2005 (*i.e.*, several months after the Deivy Felipe murder had been committed), defendant Tracey Barros was arrested by the Providence police for possession of a pistol without a license.[5] At the time of his arrest, Mr. Barros readily admitted that he possessed a firearm.

The next day, December 30, 2005, Mr. Barros was subjected to two separate interrogations at Providence police headquarters.[6] Those interrogations ultimately culminated in a confession by Mr. Barros to the effect that he had murdered Deivy Felipe at the behest of one Tonea "Nutt" Sims. (We shall hereinafter explain in detail just how Mr. Barros, who was initially arrested on a charge of possession of a firearm, eventually confessed to the murder of Deivy Felipe.)

---

thought-provoking briefs that they filed as *amici curiae:* the Innocence Network; the New England Innocence Project; Thomas P. Sullivan, Esq., Andrew W. Vail, Esq., and Robert B. Mann, Esq.; and Professor David M. Zlotnick of the Roger Williams University School of Law.

2. Several additional facts will be supplied in the "Analysis" portion of this opinion in order to provide further context for our discussion of defendant's various legal contentions.

3. The state explained the absence of complete fingerprints as being the result of heavy rain at the crime scene.

4. Unless otherwise noted, all references to the "trial" in this opinion relate to defendant's second trial, his first trial having resulted in a mistrial.

5. The defendant contends that the arrest actually occurred on December 28, rather than on December 29.

6. The first interrogation of Mr. Barros took place very early in the morning of December 30, shortly after defendant's arrest; it was of short duration. The second, more lengthy, interrogation began at approximately 8 a.m. on that same morning, after defendant had been allowed to sleep for several hours.

Although the interrogations of Mr. Barros consumed many hours of his time and that of law enforcement personnel, only the final twelve minutes of what transpired during the interrogations were captured in an audio recording. In that recording, Mr. Barros may be heard confessing to (1) having shot Mr. Felipe with a gun provided by Mr. Sims and (2) having done so at Mr. Sims's direction. Mr. Barros submits that no evidence other than this recorded confession (almost immediately repudiated by him) and the testimony of his interrogators about his earlier non-recorded inculpatory statements was presented by the prosecution at trial to connect him to the murder of Mr. Felipe; it is his contention on appeal that both his recorded and non-recorded statements should have been suppressed.

The defendant was arraigned on the firearms charge on December 31, 2005. Subsequently, on January 3, 2006, he was arraigned with respect to the murder of Mr. Felipe. On June 20, 2006, Mr. Barros was indicted by a Providence County grand jury; the indictment charged him with the following offenses: (1) the murder of Deivy Felipe, in violation of G.L.1956 § 11–23–1; (2) conspiracy to commit murder, in violation of G.L.1956 § 11–1–6; (3) carrying a pistol without a license, in violation of G.L.1956 § 11–47–8(a); and (4) discharging a firearm during a crime of violence, causing the death of Deivy Felipe, in violation of G.L.1956 § 11–47–3.2(b)(3).

On May 30 and 31, 2007, a hearing was held in the Superior Court on defendant's motion to suppress the inculpatory statements that he had made while in custody at the Providence police station on December 30, 2005. The motion to suppress was denied on June 1, 2007. A jury trial began on June 4, 2007. On June 12, the jury reported itself unable to reach a verdict, and a motion for mistrial was granted on that same day.

On January 4, 2008, prior to the commencement of the second jury trial, defendant renewed his motion to suppress. The motion was again denied, and the second jury trial commenced. On January 18, after three days of deliberations, the jury found Mr. Barros guilty on all counts. On March 10, 2008, a hearing was held on defendant's motion for a new trial; at the conclusion of the hearing, the motion was denied.

On June 2, 2008, Mr. Barros was sentenced to (1) the statutorily mandated consecutive life terms for murder and for causing death by means of a firearm; (2) a concurrent ten-year term to serve for conspiracy to commit murder; and (3) a consecutive ten-year term to serve for unlawful possession of a firearm. A timely notice of appeal was filed on June 4, 2008.

As previously indicated, defendant contends on appeal that the trial justice erred (1) in not suppressing his confession that he murdered Deivy Felipe and (2) in barring cross-examination of a prosecution witness concerning purported third-party-perpetrator evidence.

## II

### Analysis

#### A

#### The Motion to Suppress

With respect to the trial justice's denial of his motion to suppress, Mr. Barros makes a number of different arguments on appeal. He contends that (1) the trial justice erred in denying the motion to suppress because, by not fully recording the post-arrest interrogations, the police denied him his state and federal constitutional rights; (2) this Court, pursuant to its supervisory authority with respect to the

administration of justice, should rule that the inculpatory statements were erroneously admitted into evidence; (3) it was error to allow the inculpatory statements to be admitted unaccompanied by a cautionary instruction to the jury; (4) it was error to deny the motion to suppress because the inculpatory statements were involuntary; and (5) it was also error to deny the motion to suppress because defendant's inculpatory statements were the product of a failure to promptly present him before a judicial officer.

### 1. The Due Process Contention

■ The defendant's first contention on appeal is that custodial interrogations conducted in a place of detention[7] should be electronically recorded from start to finish and that his confession should have been suppressed due to the fact that the interrogations that he underwent were not recorded *in toto*. The defendant submits that the recording requirement should be derived from the due process provisions of the United States and Rhode Island constitutions or from the exercise of this Court's supervisory authority. In the alternative, defendant argues that the admission of his inculpatory statements that were contained in the twelve-minute partial recording should have been accompanied by a cautionary instruction that would address the fact that the police did not record the interrogations in their entirety.

While we acknowledge the thoughtful nature of the arguments presented by defendant and *amici* concerning the merits of fully recording custodial interrogations, it is our considered view that neither the federal due process clause nor the Rhode Island criminal due process clause provides a criminal suspect with a right to have his or her custodial interrogation electronically recorded *in toto*.

■ With respect to defendant's argument that a recording requirement should be derived from the federal constitution, we note that we very recently stated that, "neither the United States Supreme Court nor this Court has ever held that due process requires that a custodial interrogation must be contemporaneously recorded." *State v. Robinson*, 989 A.2d 965, 978 n. 23 (R.I.2010) (citing *United States v. Montgomery*, 390 F.3d 1013, 1017 (7th Cir. 2004)); *see Montgomery*, 390 F.3d at 1017 ("[W]e see no hint that the Supreme Court is ready to take such a major step."). To date, no federal appellate court has held that the federal due process clause provides a criminal suspect with a right to mandatory electronic recording. *See State v. Lockhart*, 298 Conn. 537, 4 A.3d 1176, 1184 (2010) ("[T]here is no federal precedent in support of the proposition that the federal constitution imposes a recording requirement. The federal Courts of Appeal that have considered a similar claim have uniformly rejected it."). After studying the issue afresh in a *de novo* manner, we remain convinced that the federal due process clause does not require electronic recording of custodial interrogations.

In the alternative, Mr. Barros urges this Court to reach the same conclusion as was reached by the Supreme Court of Alaska in *Stephan v. State*, 711 P.2d 1156 (Alaska 1985)—*viz.*, that the due process clause in the *state* constitution provides a criminal suspect with a right to have his or her interrogation electronically recorded. In

---

7. The defendant and *amici* use various terms to describe the circumstances or locations of custodial interrogation that would trigger the suggested recording requirement. Regardless of the terminology, we understand that the suggested requirement would apply in police stations and places of detention in which law enforcement could with relative ease have access to recording equipment.

*Stephan,* the Supreme Court of Alaska predicated its holding on the belief that "recording * * * is now a reasonable and necessary safeguard, essential to the adequate protection of the accused's right to counsel, his right against self incrimination and, ultimately, his right to a fair trial." *Id.* at 1159–60. The Alaska court in *Stephan* went on to state that a recording requirement "protects the defendant's constitutional rights, by providing an objective means for him to corroborate his testimony concerning the circumstances of the confession." *Id.* at 1161.

After careful consideration of our criminal due process clause,[8] we can perceive no basis therein for holding that mandatory recording of custodial interrogations is constitutionally required. As we discuss in greater detail below, a criminal defendant in Rhode Island is provided with ample procedural safeguards to ensure a fundamentally fair trial, even in the absence of such an additional requirement.

In the context of a challenge to the voluntariness of a defendant's inculpatory statements, such as we are confronted with in the instant case, he or she is provided with the opportunity to present testimony regarding the circumstances of the interrogation; and, to the extent that his or her testimony about those circumstances differs from that presented by witnesses for the prosecution, a defendant is also accorded ample opportunity to cross-examine those witnesses. Ultimately, any

suggestion that a failure to record a custodial interrogation on the part of law enforcement is a negative reflection on the integrity of the inculpatory statements presented at trial constitutes a question of credibility for the trier of fact. Moreover, we note that our state's Humane Practice Rule, which requires that *both* judge and jury make completely independent determinations as to the voluntariness of a defendant's statements, provides a significant additional layer of constitutional protection to criminal defendants in Rhode Island. *See State v. Dennis,* 893 A.2d 250, 261–62 (R.I.2006).

It is interesting to note that, to date, Alaska is the only American jurisdiction to hold that its state constitution provides a defendant with a due process right to have his or her custodial interrogation recorded. *See Stephan,* 711 P.2d at 1158–60; *see also Lockhart,* 4 A.3d at 1191 (noting that "*only* the Supreme Court of Alaska has concluded that electronic recording is mandated by the due process clause of its state constitution") (emphasis in original). It is also noteworthy that more than half of the jurisdictions in this country have considered the question presented by defendant in the instant case and have found that their respective state due process provisions do not require the recording of custodial interrogations. *See Lockhart,* 4 A.3d at 1188 n. 10 (collecting cases).

In the very recent case of *State v. Lockhart,* 298 Conn. 537, 4 A.3d 1176 (2010),

---

8. The criminal due process clause of article 1, section 10, of the Rhode Island Constitution sets forth several procedural due process protections afforded to criminal defendants in this state that parallel or are in addition to those protections provided by the United States Constitution. *State v. Desrosiers,* 559 A.2d 641, 643 (R.I.1989). Article 1, section 10, of the Rhode Island Constitution provides as follows:

"In all criminal prosecutions, accused persons shall enjoy the right to a speedy and public trial, by an impartial jury; to be informed of the nature and cause of the accusation, to be confronted with the witnesses against them, to have compulsory process for obtaining them in their favor, to have the assistance of counsel in their defense, and shall be at liberty to speak for themselves; nor shall they be deprived of life, liberty, or property, unless by the judgment of their peers, or the law of the land."

the Supreme Court of our neighboring state of Connecticut joined the above-mentioned majority of jurisdictions in holding that its state due process clause does not provide a defendant with a right to the electronic recording of his or her custodial interrogation. *Id.* at 1190. We note that the Connecticut court, much like the courts in a number of other jurisdictions, predicated its holding on reasoning similar to ours—*viz.*, that "there is a procedure already in place to determine if a confession is voluntary and therefore admissible." *See id.* at 1189; *see also, e.g., State v. Kekona,* 77 Hawaiʻi 403, 886 P.2d 740, 746 (1994) ("While the trial judge determines the admissibility of a confession, the defendant [still] retains the right to put before the jury, as the trier of fact, all evidence, including the facts and circumstances surrounding the making of his confession, relevant to weight or credibility. Therefore, whether the failure of the police to create a record of the defendant's confession undermines its accuracy and detracts from the credibility of later testimony is an issue uniquely left to the sound discretion of the trier of fact.") (brackets in original) (internal quotation marks and citation omitted).

## 2. This Court's Supervisory Authority

We also decline to exercise our supervisory authority so as to promulgate a mandatory recording requirement.

■ It is well established that "[t]he exercise of our supervisory jurisdiction is an extraordinary measure." *State v. Feng,* 421 A.2d 1258, 1273 (R.I.1980); *see also State v. Saback,* 534 A.2d 1155, 1157 (R.I. 1987). Moreover, where "[c]reation of a new rule * * * will affect a large number of cases," such creation of a new rule "may

require input from many sources." *Feng,* 421 A.2d at 1273. The mandatory rule that defendant asks us to promulgate is just such a rule. By its very nature, the proposed instruction would, in the words of this Court in *Feng,* 421 A.2d at 1273, "affect a large number of cases"—*viz.*, nearly every criminal case involving custodial interrogation with respect to the investigation of felonious conduct. Consequently, we believe that, again quoting from *Feng,* "input from many sources" is eminently advisable in this matter.[9]

## 3. The Jury Instruction Contention

■ We also decline to require that a cautionary instruction be given whenever the prosecution relies upon an unrecorded or partially recorded custodial interrogation—since such a mandate would be inconsistent with well-settled principles that have been articulated in our cases. On appeal, defendant argues (as he did in the trial court) that, if his unrecorded custodial statements should not have been suppressed, they should have been accompanied by a cautionary instruction to the jury concerning "the inferences which could be drawn from the police failure to fully record the interrogation." (At no point does defendant clearly spell out precisely which inferences he believes should be drawn.)

At the second trial, defendant requested two jury instructions—one derived from an instruction adopted by the Supreme Judicial Court of Massachusetts in *Commonwealth v. DiGiambattista,* 442 Mass. 423, 813 N.E.2d 516 (2004), and one derived from an instruction employed in New Jersey pursuant to Rule 3:17 of the New Jersey Rules Governing Criminal Practice.

9. In *State v. Lockhart,* 298 Conn. 537, 4 A.3d 1176 (2010), the Supreme Court of Connecticut recently declined a similar invitation to

mandate an electronic recording requirement pursuant to an exercise of its supervisory powers.

In her opinion for the Supreme Judicial Court in *DiGiambattista,* Justice Martha Sosman wrote in pertinent part as follows:

> "[W]hen the prosecution introduces evidence of a defendant's confession or statement that is the product of a custodial interrogation * * * and there is not at least an audiotape recording of the complete interrogation, the defendant is entitled * * * to a jury instruction advising that the State's highest court has expressed a preference that such interrogations be recorded whenever practicable, and cautioning the jury that, because of the absence of any recording of the interrogation in the case before them, they should weigh evidence of the defendant's alleged statement with great caution and care. Where voluntariness is a live issue and the humane practice instruction is given, the jury should also be advised that the absence of a recording permits (but does not compel) them to conclude that the Commonwealth has failed to prove voluntariness beyond a reasonable doubt." *DiGiambattista,* 813 N.E.2d at 533–34.[10]

The jury instruction to which the *DiGiambattista* court said a defendant is "entitled" sends a strong signal to the jury that any statements that are the product of an unrecorded interrogation may well not have been voluntary.

We have carefully considered defendant's argument in favor of such a jury instruction. However, for the reasons set forth above (in sections "II A 1" and "II A 2" of this opinion, *supra* ), we remain unpersuaded that we should require the giving of an instruction similar to that articulated by the Supreme Judicial Court in *DiGiambattista.*

Furthermore, we are satisfied that juries in this state routinely receive adequate instructions with respect to the voluntariness *vel non* of custodial interrogations—most notably because of our Humane Practice Rule, a rule which provides an important procedural safeguard with respect to the constitutional rights of criminal defendants. *See Dennis,* 893 A.2d at 261–62. Our Humane Practice Rule "requires that judge *and* jury make separate and independent determinations of voluntariness * * *." *Id.* at 262 (emphasis added). In other words, the Humane Practice Rule provides that any statement of a criminal defendant "may not serve as a basis for conviction unless **both** judge and jury determine that it was voluntarily made." *Id.* (emphasis in original).

For the same reasons that have led us to conclude that we shall not do as the Supreme Judicial Court of Massachusetts did in *DiGiambattista,* we also decline to accede to defendant's suggestion that we require the giving of an instruction similar to that set forth in the New Jersey Criminal Jury Charges, pursuant to Rule 3:17 of New Jersey's Rules Governing Criminal Practice. Such an instruction would require trial justices in effect to act as advocates and to comment extensively upon the evidence presented at trial—a practice that our well-settled case law clearly and consistently has held to be undesirable.

As we have stated in the past with great clarity, "[i]t is not the function of a trial justice to act as advocate for either the prosecution or the defense." *State v. Fenner,* 503 A.2d 518, 525 (R.I. 1986). In the context of providing instruc-

---

**10.** The reference to "the humane practice instruction" in the extract from the *DiGiambattista* opinion quoted in the text hearkens back to the Supreme Judicial Court's opinion in the venerable case of *Commonwealth v. Preece,* 140 Mass. 276, 5 N.E. 494, 495 (1885). *See State v. Dennis,* 893 A.2d 250, 261 n. 17 (R.I.2006).

tions to the jury, we have interpreted the just-quoted principle as meaning that "judges are inhibited from commenting upon the evidence unless they do so in a completely impartial manner." *Id.* Rather, in Rhode Island's adversarial system, it is the advocates who are to employ direct examination, cross-examination, closing argument, and other permissible means in order to seek to persuade the jurors as to the credibility (*vel non*) of witnesses (including the credibility of prosecution witnesses who testify about what transpired during a custodial interrogation). We have carefully considered the arguments of the parties and of *amici;* at the end of the day, however, we perceive no reason for departing from what we wrote in *Fenner:* "Counsel rather than the court are the appropriate agents to argue to the jury concerning the specific credibility or lack thereof of a particular witness." *Id.* We continue to see merit in requiring that, if a trial justice deems it necessary to comment upon the evidence during the course of jury instructions, he or she should "do so in a completely impartial manner." *Id.* We are persuaded that cross-examination [11] remains an especially potent tool whereby the jury is provided with a meaningful basis upon which credibility assessments can be made; it is our belief that, when that tool is combined with effective direct examination and a well prepared closing argument, the jury is provided with an entirely sufficient basis for passing on the crucially important issue of credibility—an issue that is key to determinations of voluntariness.

In the instant case, in which both the prosecution and the defense had ample opportunity to present trial testimony (subject to cross-examination) recounting their respective versions of what transpired during the interrogation of Mr. Barros, the task for the jury during its deliberations was to make just such a credibility assessment. Accordingly, we see no reason to depart from our existing practice; defense counsel is always free to raise specific points related to witness credibility during cross-examination and to argue about credibility on the basis of such points during closing argument. We are satisfied that counsel for Mr. Barros took ample advantage of the opportunity to do just that at trial.

### 4. The Alleged Involuntariness of the Confession

On appeal, defendant asserts that the trial justice also erred in denying the motion to suppress because, in defendant's view, the prosecution failed to prove by clear and convincing evidence that Mr. Barros's inculpatory statements were voluntary and were made after a knowing and intelligent waiver of his constitutional rights. (It will be recalled that a two-day hearing on the motion to suppress was conducted on May 30 and 31, 2007, shortly before the beginning of the first trial. It will also be recalled that defendant renewed his motion to suppress before the beginning of the second trial. On both occasions, the motion was denied.)

At the suppression hearing, witnesses for the prosecution and for the defense

---

**11.** In *State v. Tiernan,* 941 A.2d 129 (R.I. 2008), we extolled at some length the virtues of cross-examination and quoted from a highly respected treatise. We observed in pertinent part as follows:

"Cross-examination connotes searching and often intense scrutiny. * * * Cross-examination, when well conducted, is not a desic-

cated syllogistic exercise, but is rather a multifaceted attempt at unveiling what might lie behind the direct testimony of the witness. * * * In the same vein, cross-examination has been described by [Professor John H. Wigmore] as 'beyond any doubt the greatest legal engine ever invented for the discovery of truth.' " *Id.* at 133–34.

presented starkly different accounts as to just when Mr. Barros was arrested and as to what transpired between the moment of his arrest and the point in time several hours later when the twelve-minute electronic recording of his confession was made. Accordingly, we shall next summarize as succinctly as possible the evidence that was presented by both parties in connection with the motion to suppress.

### a. Testimony of the Witnesses for the Defense

The defendant testified during his direct examination at the suppression hearing that he was arrested shortly before midnight on *December 28, 2005*—and not on December 29, 2005, as the prosecution contended. (Mr. Barros testified that he knew that his arrest took place just before midnight because he was still in possession of his cell phone when he was placed in the back of a police car and was able to ascertain the time by consulting that cell phone.) On cross-examination during the suppression hearing, defendant continued to maintain that he was arrested just before midnight on December 28 and that he signed a rights form [12] in the early morning hours of December 29. However, the prosecution then confronted defendant with his signed rights form, which was dated December 30. Upon being so confronted, defendant replied: "[T]hey could have told me what the date was, just like they tried to get it over and say I didn't get arrested on the 28th, but I did."

Mr. Barros testified that, just prior to his arrest, Officer John Black (one of the officers at the scene) asked him why he was in possession of a gun; and he testified that, in reply to the officer's question, he admitted carrying the gun and "just told him [that his] neighborhood is dangerous." The defendant further testified that, after he was arrested by Officer Black, the police officer conducted a "quick frisk" of his person but did not take his cell phone from him. The defendant further testified that he was then handcuffed and placed in the back of Officer Black's cruiser. He then testified that, from the back of the police cruiser, he observed a white Explorer truck arrive at the scene. It was the testimony of Mr. Barros that Officer Black gave the gun that had been in defendant's possession to an officer in the Explorer, who then used a laptop to "[run] the serial numbers in on it." The defendant further testified that he was able to read the lips of the officer in the Explorer as saying to Officer Black that "the gun was clean."

Mr. Barros proceeded to testify that it was at this moment that his cell phone vibrated in his pocket. The defendant testified that, even though his hands had been placed in steel handcuffs behind his back, he was handcuffed "mostly to the left side" and accordingly was able to answer the cell phone by "[flipping] it open" and using the phone's speaker function. According to Mr. Barros, the caller was April Potts, his girlfriend; he testified that he told Ms. Potts that he had been arrested for carrying a firearm. He stated that he asked Ms. Potts to call his lawyer, one Benjamin Mesiti, who he said had represented him in the past; Mr. Barros added that he asked his girlfriend to request that the lawyer come to the police station.

Mr. Barros then testified as to what occurred after he was taken to the Providence police station. He stated that he was placed in a "holding cell" for approximately an hour or an hour and a half before being transported to an interroga-

---

**12.** The several references in this opinion to a "rights form" relate to the printed form that advises an individual of his or her rights pursuant to the United States Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tion room, where he was handcuffed to a bar on the wall. The defendant then offered internally inconsistent testimony with respect to how long he waited in the interrogation room before someone arrived to question him.

On his first day of testimony at the suppression hearing, he recalled waiting alone in the interrogation room for at least one hour before Special Agent Michael West of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) entered the room in the early morning hours of December 29, followed shortly by Detective Michael Fallon.

On his second day of testimony, however, defendant said that he recalled waiting in the interrogation room for "almost a whole day" before he was joined by anyone from the Providence Police Department or from ATF. It was his testimony on that second day that he waited, being all the while handcuffed to the wall of the interrogation room, until Agent West and Detective Fallon arrived at approximately 2 a.m. on December 30. Regarding this discrepancy, defendant testified as follows: "I misunderstood. I thought you was talking about when they brought me upstairs from the detaining room." He further testified as follows regarding how he knew that he had been in the interrogation room for a long period of time:

"[I]t was dark when I went up early morning, signed the rights form, and then they left, and then it was daybreak. You could see because the door was open, and they got windows, and the sun comes in the window. Then, by the time they all came back in there again, it was dark time."

The defendant further testified by way of clarification that the windows that he was referring to were not in the interrogation room itself but rather were in the hallway.

We now move on from the inconsistency with respect to *when* Agent West and Detective Fallon joined defendant in the interrogation room, and we turn to his testimony as to *what* occurred once they were there. The defendant testified that it was Detective Fallon who advised him of his rights by providing him with a *Miranda* rights form. Although defendant acknowledged signing the form, he testified that he could not "read that well" and understood the nature of the form only "a little bit." Mr. Barros testified that he signed it because Detective Fallon informed him that, by signing the form, he was simply acknowledging that he had been apprehended with a firearm. When cross-examined, however, defendant testified that he actually did understand his rights and that, after signing the form and indicating that he understood his rights, he chose to speak with Detective Fallon.

It was defendant's testimony that Detective Fallon then sought to have him confirm the statement that he had made to Officer Black at the time of his arrest regarding his possession of a gun. He testified that he acknowledged having made such a statement, but he added that he had declined to memorialize that acknowledgment in a written statement because he was too tired and because he wished to wait until his lawyer was present.

Mr. Barros proceeded to testify that Detective Fallon began to inquire about other matters concerning which he had no knowledge. The defendant stated that he informed the detective that he was too tired and did not wish to speak with him further; he added that he informed Detective Fallon that his lawyer was on his way and that he did not wish to speak with them further until his lawyer was present.

The defendant then offered internally inconsistent testimony as to precisely what

transpired next. During his first day of testimony, he testified that ATF Agent West and Detective Fallon then left the interrogation room, where defendant remained alone for approximately half an hour until Agent West returned accompanied by ATF Special Agent Edward Troiano. The defendant testified that the ATF agents did not advise him of his rights but rather immediately began to ask where he had obtained his gun. The defendant stated that he refused to provide the ATF agents with that information, but he maintained during cross-examination that he had not obtained the gun from Tonea Sims. The defendant further testified that he informed the ATF agents that his lawyer was coming to the station, and he stated that the ATF agents laughed in response. The defendant next testified that Agent Troiano began to inquire about Mr. Sims—asking defendant whether he knew Mr. Sims. During his second day of testimony, defendant's recollection was that Agent West and Detective Fallon remained in the room and that it was Agent West who asked him whether he knew Mr. Sims.

Regardless of the inconsistency in his testimony with respect to which ATF agent asked the question, defendant testified consistently that he responded that he knew Mr. Sims. The defendant testified during the suppression hearing that his friendship with Mr. Sims was an occasional friendship; he testified that he saw Mr. Sims "once a month" and that their friendship revolved around "making music and doing DVD's" together. According to defendant's testimony, Agent West then informed him that Mr. Sims had been shot and killed. The defendant testified that he was shocked and that this was the first that he had heard of Mr. Sims's death—since, according to defendant, Mr. Sims was alive at the time of his own arrest. The defendant testified that he again told the officers that he did not want to talk with them further, that he continued to ask for his lawyer, and that they never informed him that his lawyer was present at the station. The defendant testified that Agent West and Detective Fallon then left the room.

Mr. Barros testified that, approximately one or two hours later, Agent West and Detective Fallon returned, along with Agent Troiano. According to defendant's testimony on the second day of the suppression hearing, this was his first encounter with Agent Troiano. The defendant testified that Agent Troiano asked whether Mr. Barros could help with his investigation into the activities of Mr. Sims. It was defendant's testimony that at that point he was tired, hungry, and in need of a restroom but that all of these conditions were ignored.

Mr. Barros testified that Detective Daniel O'Connell then entered the interrogation room. According to defendant, Detective O'Connell at first merely observed the interrogation and did not participate. The defendant testified that Agent Troiano proceeded to suggest that, if defendant would help him with his investigation of Mr. Sims, the ATF agent could "make a better deal for [defendant]." The defendant said that Agent Troiano explained that he was looking for information regarding who murdered Mr. Sims or where Mr. Sims maintained a drug "stash" or where he kept his guns. According to defendant, he was baffled by Agent Troiano's offer of a "better deal," and he informed the agent that he did not have any information to provide regarding any of the matters about which the ATF agent was concerned.

According to Mr. Barros, the detectives and the ATF agents then left the room for approximately one hour. He testified that,

thereafter, every time the ATF agents or the detectives would return to the interrogation room, "they'd bring [him] information, they'd bring stuff to [him]." According to defendant's testimony, at one point, Detective O'Connell began to question him about a shooting in the West End of Providence.[13] Mr. Barros told them he did not know anything about such a shooting and that he "never hung out in the west end."

The defendant testified that, despite the fact that he did not know anything about the shooting in the West End that Detective O'Connell had referred to, he eventually agreed to make a statement that would be electronically recorded. He explained his decision to do so as follows:

"As time went by, I just realized that they put me in a catch–22. There was no way I was going to get out of there. Officer Troiano came back with my criminal rap sheet. I come to find out what it was, and he placed it in front of me. He just basically told me I just got through doing five years for a gun, and now I'm convicted on another gun charge. He told me I was looking at ten, fifteen years federal time easy. He said he's an ATF officer and he has people in high places. * * * He told me that they think I know more about Tonea Sims than what I'm telling them, and he said it was in my best interest to cooperate with him. And I just basically, I just said I was in a position where they wasn't going to let me go anyway."

The defendant then testified that Detective O'Connell and Agent West told him what they wanted him to say in the statement that would be recorded—telling him that "it had to be good, it had to sound like it was some real stuff." Mr. Barros testified that, at approximately 12:45 p.m., while exhausted and with his arm being numb from being cuffed to the wall for over a day, he signed another rights form and then his twelve-minute statement was recorded. During cross-examination at the suppression hearing, defendant acknowledged that he did not request to speak with his lawyer at the time that his statement was recorded, and he also acknowledged that he signed the second rights form because he understood his rights.

Mr. Barros testified that, after his statement was recorded, he was allowed to make a phone call on Detective O'Connell's cell phone to call his girlfriend, April Potts. The defendant stated that, when he spoke with Ms. Potts by phone, she informed him that she and his lawyer had been at the police station looking for him but were informed that he was not there. The defendant testified that he then "got tense * * * and felt like that they got over on [him]." He testified that he then informed Detective O'Connell that he wanted to revoke his statement because he had been tricked. Mr. Barros testified that Detective O'Connell told him that it was too late, to which statement Mr. Barros responded by asking to speak with the detective's supervisor. He testified that Major Stephen Campbell entered the interrogation room and also informed him that it was too late to retract his statement.

Attorney Benjamin Mesiti testified at the suppression hearing that, at the time of defendant's arrest, he was employed by a particular Rhode Island law firm. He stated that, by the time of the suppression hearing, he was practicing law on his own and no longer had access to his records from December of 2005 (when defendant was arrested). Accordingly, he indicated that he could not recall with great specific-

---

13. The relevance of the shooting in the West End of Providence will become apparent when one reads the next section of this opinion.

ity the dates and events about which he was asked to testify. He did state that he recalled going to the Providence police station to speak with a client on *either* December 29 *or* December 30, 2005. He said that he could not recall which date it actually was when he went to the police station, but he also stated that he "believe[d] it might have been the 30th." He testified that he had gone to the police station on one of the December dates in response to a phone call that had been received at the law office where he was then employed; he added that he believed that the person who called his law office was defendant's girlfriend, April Potts. He also recalled "meeting a female * * * in the waiting area of the police station" and waiting for a "significant amount of time," but he added that he was not able to recall whether or not he was actually able to see defendant. When pressed regarding the time that he left his law office to go to the police station, attorney Mesiti testified that he probably left the office between 7:30 and 8:30 p.m.

Attorney Mesiti further testified that he had not been retained to represent Mr. Barros in connection with any of the charges at issue in the instant case; moreover, he was not able to recall whether he had represented Mr. Barros on any prior occasion. Attorney Mesiti did testify, however, that he recognized Mr. Barros.

### b. Testimony of the Witnesses for the Prosecution

Providence Police Officer John Black, one of the officers who arrested defendant, testified at the suppression hearing that the arrest of defendant actually occurred on the night of *December 29, 2005.* When confronted with his witness statement and his police incident report, on both of which he had indicated that defendant was arrested on December 28, Officer Black testified that he was mistaken in so indicating

and had made a "typographical error" on those two documents. He again insisted that the arrest had actually taken place on December 29 in the nighttime.

Providence Police Detective Michael Fallon testified at the suppression hearing that, at approximately 2 a.m. on December 30, 2005, he conducted an interview of defendant. Detective Fallon testified that he showed defendant a *Miranda* rights form, asked him to read it, and ascertained that defendant understood his rights. The detective stated that he also explained the rights to defendant, asked him whether he had any questions, and watched as defendant "checked that he did understand the rights." He further testified that defendant signed his name on the rights form and provided his address. Detective Fallon testified that his purpose in interviewing Mr. Barros was to confirm that he had made certain statements to the arresting officers regarding his having been in possession of a firearm when arrested. He described defendant as having been calm and cooperative during the interview. He also testified that defendant did not indicate at any point either that he did not want to cooperate further or that a lawyer was on his way to represent him.

According to Detective Fallon, during that early morning interview, defendant readily admitted that he had been carrying a weapon at the time of his arrest, and he confirmed the statements that he had made to the arresting officers as to his reason for being in possession of a firearm. However, the detective added that defendant declined to make a statement on paper or in an audio recording; he testified that defendant said that he just wanted to go back to sleep. Detective Fallon testified that, at some point before Mr. Barros was returned to his cell, he also sought to try to glean from defendant information about other crimes and occurrences in the

city—as he indicated was standard practice among Providence police detectives in situations such as the one with which he was then confronted. According to Detective Fallon, defendant indicated that, although he had "a lot" of information that he could provide, at that time he was "just tired." Detective Fallon testified that, after concluding the interview and in accordance with the Providence Police Department's policy with respect to gun arrests, he proceeded to notify ATF about defendant's arrest.

ATF Special Agent Michael West testified at the suppression hearing that he arrived at Providence police headquarters at approximately 8 a.m. on December 30 in order to interview Mr. Barros. Agent West stated that, prior to beginning the interview, he had seen a *Miranda* rights form that had been signed by defendant. According to Agent West's testimony, he began the interview by asking defendant whether his rights had been read to him, whether he understood those rights, and whether he was willing to speak with Agent West. The ATF agent testified that defendant answered all three questions in the affirmative. Agent West also stated that at no point during the interview did defendant indicate that he did not understand his rights, that he wanted to speak with an attorney, or that he wished to end the interview.

Agent West testified that defendant told him that he had obtained the firearm that was in his possession when he was arrested from his friend Tonea Sims, whom defendant referred to as "Nutt." [14] The agent added that defendant also mentioned to him that "Nutt" had just been shot and killed.[15] Agent West further testified that, because he knew that fellow ATF Special Agent Edward Troiano had been conducting an investigation into the activities of Mr. Sims, he notified Agent Troiano by telephone with respect to what defendant had been saying during his interview with Agent West. (Agent West stated that he thought that speaking with defendant might assist Agent Troiano's investigation.)

ATF Special Agent Troiano testified at the suppression hearing that, after receiving a phone call from Agent West, he arrived at the Providence police station at some point between 9 and 10 a.m. on December 30, 2005. Agent Troiano testified that he knew that Mr. Barros had executed a rights form because it was in the arrest packet that was provided to him by the Providence police. The ATF agent also testified that, prior to interviewing defendant, he confirmed with him that he had been advised of his rights. It was Agent Troiano's testimony that defendant was emotional and distraught over the death of Mr. Sims, but he added that defendant did not seek to bring the interview process to a halt at any time nor did he ask to speak with an attorney.

Detective Daniel O'Connell[16] testified at the suppression hearing that he arrived at the Providence police station at 9 a.m. on December 30, 2005. He stated that he had been working through the previous night,

---

**14.** "Nutt" was the sobriquet by which defendant referred to Tonea Sims. We shall, however, usually refer to this person simply as Tonea Sims or Mr. Sims.

**15.** According to Agent West's testimony, Mr. Barros's words about the shooting of Mr. Sims were: "I got it from my boy. They shot him last night."

**16.** ATF Agents West and Troiano also offered testimony at the suppression hearing that is consistent with much of Detective O'Connell's testimony about defendant's interrogation and eventual confession. For the sake of brevity, however, we shall summarize only Detective O'Connell's testimony about what transpired after he entered the interrogation room.

investigating the murder of Tonea Sims. He testified that, shortly after his arrival at the police station, he was informed that a suspect in one of the interview rooms had information regarding Mr. Sims. That suspect was Mr. Barros. Detective O'Connell stated that, in view of his interest in the Sims murder, he joined ATF Agents West and Troiano in the interview room in the hope that defendant could provide him with information that might assist him in his investigation of that murder. According to the detective, defendant was handcuffed to a bar on a wall in the interview room; he further testified that such was a standard operating procedure of the Providence police.

Detective O'Connell testified that he asked defendant whether he had any information regarding the murder of Mr. Sims. The detective testified that defendant stated that he did not have any "direct knowledge" about the murder, but he said that he had information about certain of Mr. Sims's "enemies." It was the detective's testimony that defendant was clearly aware of the death of Mr. Sims prior to the interrogation and that the detective and ATF agents did not provide him with that information.

Detective O'Connell testified that he then began to ask defendant more probing questions regarding his relationship with Mr. Sims. In the detective's estimation, defendant was proud of that relationship and was pleased to speak freely about it with the detective and the ATF agents. Detective O'Connell stated that defendant volunteered information regarding two shootings that involved Mr. Sims. According to Detective O'Connell, defendant said that he had witnessed one of the shootings and had participated in the other. Detective O'Connell indicated that he then left the interview room in order to verify through police department records the oc-currence of both of the shootings that defendant described. It was the detective's testimony that he was in fact able to verify the occurrence of the just-mentioned two shootings.

Detective O'Connell testified that, after returning to the interview room, he asked defendant whether he had ever "hit anyone." (The detective explained that by that question he was inquiring as to whether defendant had shot someone and "actually hit that person.") The detective testified that defendant replied by simply stating: "Yeah. A Spanish kid over on Superior Street." Detective O'Connell testified that he then asked defendant to provide him with specific details regarding the shooting of the "Spanish kid." The detective stated that defendant said that he thought that this particular shooting had occurred at some point between April 15 and May of 2005. The detective testified that defendant proceeded to provide additional details about the shooting of the "Spanish kid"—namely, that the victim was sitting in a parked SUV near a Chinese restaurant when defendant ran up to his car and shot him.

Detective O'Connell testified that he then left the interview room to consult the police database for possible information about a felony assault that corresponded with the location and time frame of the shooting that defendant had described as having occurred on Superior Street. The detective stated that he could find no such match but that he did recall a shooting of a person in a SUV—namely, the April 27, 2005 murder of Deivy Felipe on Althea Street. He testified that he then gathered information and photographs relative to the Felipe murder and returned to the interview room.

Detective O'Connell then asked defendant whether he was sure that he had shot someone on Superior Street. The detec-

tive said that defendant admitted that he did not actually know the name of the street where he had carried out the shooting of a "Spanish kid" in a SUV, but he recalled that it was "off of Cranston Street" and that a mag wheel store is located there. Detective O'Connell testified that it became clear to him that defendant was referring to the Felipe homicide. The detective stated that he knew that a "mag wheel place is located at Althea and Cranston Street" and that there is a Chinese restaurant "adjacent to that mag wheel place."

Detective O'Connell testified that he asked defendant whether he was certain about what he had just said. The detective stated that defendant replied, "Yeah, I'm positive that was at the mag wheel place." According to Detective O'Connell, defendant then proceeded to describe the just-referenced shooting in greater detail. The detective testified that defendant provided the following description of how the homicide was carried out: defendant and Mr. Sims were driving in a Jeep Cherokee; they saw the eventual victim in a SUV parked near a Chinese restaurant; Mr. Sims handed defendant a gun and instructed him to shoot the victim; defendant ran toward the vehicle; as defendant was running toward the SUV, a person "jumped over the passenger seat, leaving the door open;" and, finally, defendant ran up to the SUV and shot the victim.

Detective O'Connell testified that he then proceeded to show defendant a series of photographs for identification purposes. He testified that he first showed him a copy of Mr. Felipe's Florida driver's license;[17] he stated that defendant said that he knew the person pictured and had met him a couple of times. Detective O'Connell testified that he then showed defendant a picture of the vehicle in which Mr. Felipe had been sitting; according to the detective, defendant also recognized the pictured vehicle and said, "I told you it was a blue SUV." The detective stated that he then presented defendant with a "picture of the kid in the front seat slumped over the wheel." According to Detective O'Connell's testimony, it was at this moment that defendant realized that the person that he had shot had actually perished; the detective said that defendant then began to cry.

According to Detective O'Connell's testimony, defendant sought to deny having committed the Felipe murder as soon as he realized that he had just confessed to it—saying repeatedly: "It wasn't me. It wasn't me." It was at this point that Detective O'Connell said that he was informed by his superiors that he would need to record defendant's statement. Detective O'Connell testified that defendant then revealed to him that he was worried about serving time in Rhode Island because he had a number of enemies and feared for his safety. Detective O'Connell stated that a call was made to the attorney general's office by one of his superiors and that the attorney general's office agreed to allow defendant to serve out of state any sentence that might be imposed. According to Detective O'Connell, defendant eventually agreed to provide a statement. However, Detective O'Connell testified that, prior to giving the statement, defendant asked to see a photograph of Mr.

---

17. Detective O'Connell's actual testimony at the suppression hearing was that he showed defendant a "Florida license of the vehicle." We infer that the detective meant to say that he showed defendant Mr. Felipe's Florida driver's license. Otherwise, his testimony about defendant's response would be a non sequitur—since Detective O'Connell testified that defendant said that he recognized *the person* pictured in what the detective had shown him.

Sims's body, saying that he wanted proof that Mr. Sims was dead. Detective O'Connell testified that, after defendant saw a photograph of the dead body of Mr. Sims, he became very emotional.

Detective O'Connell testified that defendant was provided with a sandwich prior to giving his recorded statement. The detective further stated that, in his estimation, defendant did not have any appetite due to the fact that he remained nervous and emotional.

Detective O'Connell testified that, at the beginning of the tape-recorded statement, he read defendant his rights once again and presented him with a new rights form, on which it was indicated that defendant was charged with homicide. According to the detective, defendant indicated on the form that he understood his rights and provided his signature, his address, and the date.

Detective O'Connell testified that, after defendant completed his tape-recorded statement, he made a phone call using the detective's cell phone. The detective testified that the first thing that defendant told the person he called was that he was in the Providence police station and had just confessed to a murder. The detective testified that he did not hear Mr. Barros mention the word "lawyer" or "attorney." The detective stated that, in his estimation, the person on the other end of the phone was probably defendant's girlfriend—because, when he asked to use the detective's phone, defendant had indicated that he wished to call her.

Detective O'Connell testified that, after defendant made his tape-recorded statement, he was taken back to a holding cell. The detective stated that, in his estimation, it was too late to take defendant to District Court that day because the detective needed to finish his paperwork pertaining to the investigation.

The various witnesses for the prosecution testified that, although defendant was sometimes emotional during the interview, at no point did he request a lawyer, try to end the interview, invoke his right to silence, or mention that he had called his girlfriend when he was arrested. Detective O'Connell testified that the interview with defendant lasted from approximately 9:30 a.m. to 12:45 p.m., at which point the decision was made to make an audio recording of defendant's statement. The detective also testified that at no point did the detective or any of the ATF agents "feed" defendant information regarding the crime to which defendant confessed. Detective O'Connell also testified that defendant was not pressured into providing the statement, nor was he threatened with having more severe charges levied against him if he refused to cooperate. It was the detective's testimony that, during the course of the interview, defendant wanted to speak with him and with the ATF agents and was both accommodating and forthcoming. Detective O'Connell testified that the door to the interview room was open during the entire interview and that defendant never asked to use the bathroom. The detective also testified that defendant was provided with soda and water on a number of occasions during the course of the interrogation.

Detective O'Connell also offered testimony at the suppression hearing for the purpose of rebutting certain specific contentions of defendant. Detective O'Connell described the room where he and the ATF agents interviewed defendant, stating that there are no windows in that room that face outdoors. He also testified regarding the technology that was available at the time of defendant's arrest; he stated that his police department was not then equipped with the necessary technology to "run a serial number" found on a gun

obtained at a crime scene while the police officers were still at the crime scene.

### c. The Findings of Fact and the Ruling of the Trial Justice

At the conclusion of the hearing on defendant's motion to suppress, the trial justice expressly ruled that defendant had offered testimony which the trial justice found "not credible at all." He further stated: "I'm satisfied from what I've heard that the defendant lied to me in certain respects, and those lies and mendacious statements cast a very dim light on his credibility." After making that damning statement about defendant's credibility, the trial justice proceeded to make a number of specific findings of fact.

The trial justice stated that he did not believe that defendant was "able to play Houdini and get [his] cell phone out of his pocket." He also expressed disbelief about defendant's testimony regarding the presence of a white Explorer at the arrest scene; he stated that he was "satisfied [that] the defendant simply made that up." The trial justice found that defendant was apprised of his *Miranda* rights and that he understood them. He also stated that he did not believe that defendant had insisted on speaking with an attorney prior to speaking with the Providence police detectives and the ATF agents. He also said that he did not believe defendant's testimony that he was left to languish for hours unattended while handcuffed to a bar in the interview room. He also rejected as not credible defendant's assertion that he was deprived of food, water, and access to restroom facilities. The trial justice also completely rejected defendant's allegation that the law enforcement officers had forced him into providing a recorded confession that was scripted by them.

Citing this Court's opinion in *State v. Sabetta,* 680 A.2d 927 (R.I.1996), the trial justice ruled, as a matter of law, that defendant's simply saying that he was too tired to continue did not amount to an invocation of his right to silence. Although the trial justice did not make a specific finding as to whether or not exhortations or threats had occurred, he cited a number of cases in support of the proposition that police exhortations to tell the truth or police threats regarding "hard time" are permissible and are not inherently coercive.[18]

The trial justice then addressed the fact that defendant was handcuffed while in the interrogation room. His analysis began with the basic proposition that the mere fact that a defendant is "in custody in a police station and handcuffed, does not * * * automatically lead to the conclusion that his statements were involuntary." He noted that "it is a factor to be considered, but [it] is in no way dispositive of [the] issue;" and he cited *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), in support of that proposition. He also cited *State v. Fuentes,* 433 A.2d 184, 189 (R.I.1981), for the general principle that "[n]either custody nor questioning serves automatically to invalidate a confession." In addition, citing *State v. Apalakis,* 797 A.2d 440 (R.I.2002), the trial justice ruled that handcuffing a person during an interrogation does not necessarily render the person's statement involuntary and is in fact justified by legitimate concerns for police officer safety. With respect to the instant case, the trial justice stated that he did not believe defendant's assertion that

---

18. The cases cited by the trial justice in support of his ruling about police exhortations and threats are: *Crooker v. California,* 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958); *United States v. Braxton,* 112 F.3d 777 (4th Cir.1997); *State v. Apalakis,* 797 A.2d 440 (R.I.2002); *State v. Marini,* 638 A.2d 507 (R.I.1994).

the handcuffs caused him such discomfort that it had a bearing on the voluntariness of his waiver of rights.

On the question of presentment, the trial justice did not make a specific finding of fact as to the precise date of defendant's arrest. He did find, however, that attorney Mesiti's testimony was not helpful to defendant. Although he made no finding as to the date of arrest, the trial justice indicated that he was satisfied that defendant never said that he did not want to speak with the officers; accordingly, he ruled that any delay in presentment was not operative in inducing the confession. He also cited *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), for the proposition that prompt presentment does not mean immediate presentment and that presentment within forty-eight hours after arrest is generally adequate.

In sum, the trial justice found that defendant was overcome by the knowledge of Mr. Sims's death and that his consequent emotional state is what fueled defendant's desire to unburden himself. He observed that a confession prompted by remorse or other emotional states is no less a product of free and voluntary choice; in support of that principle, the trial justice citied *Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *State v. Briggs*, 756 A.2d 731 (R.I.2000); *State v. Marini*, 638 A.2d 507 (R.I.1994); and *State v. Verlaque*, 465 A.2d 207 (R.I.1983).

### d. This Court's Review of the Foregoing

### i. The Standard of Review

■ When ruling on a motion to suppress a confession, the trial justice should "admit a confession or a statement against a defendant only if the state can first prove by clear and convincing evidence that the defendant knowingly, intelligently, and voluntarily waived his [or her] constitutional rights expressed in *Miranda v. Arizona*." *State v. Bido*, 941 A.2d 822, 835 (R.I.2008) (brackets in original) (internal quotation marks omitted); *see also Robinson*, 989 A.2d at 974; *State v. Taoussi*, 973 A.2d 1142, 1146 (R.I.2009); *Dennis*, 893 A.2d at 261; *State v. Humphrey*, 715 A.2d 1265, 1274 (R.I.1998).

■ This Court's review of a trial justice's ruling with respect to a motion to suppress a statement which a defendant has alleged was made involuntarily requires "a two-step analysis." *Taoussi*, 973 A.2d at 1146; *Bido*, 941 A.2d at 835. In the first step, we review the trial justice's findings of historical fact relative to the issue of the voluntariness of the confession. *Taoussi*, 973 A.2d at 1146; *Bido*, 941 A.2d at 835. We accord deference to the trial justice's findings of historical fact unless those findings are clearly erroneous. *Taoussi*, 973 A.2d at 1146; *Humphrey*, 715 A.2d at 1273. A finding of fact is clearly erroneous "when, although there is evidence to support it, the reviewing court on the basis of the entire evidence is left with the definite and firm conviction that a mistake has been committed." *State v. LaRosa*, 112 R.I. 571, 576, 313 A.2d 375, 377 (1974); *see also United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *Taoussi*, 973 A.2d at 1146; *State v. Perez*, 882 A.2d 574, 588 (R.I.2005).

■ If we conclude that the trial justice's findings of historical fact were not clearly erroneous, we proceed to the second step of our analysis. At the second step, we "apply those historical facts and review *de novo* the trial justice's determination of the voluntariness of the statement." *Bido*, 941 A.2d at 836; *see also Taoussi*, 973 A.2d at 1146–47; *Humphrey*, 715 A.2d at 1274. (We conduct a *de novo*

review of a trial justice's determination of voluntariness due to the fact that the "question of whether a confession was given voluntarily is legal in nature." *Dennis*, 893 A.2d at 261.)

 A statement is *voluntary* "when it is the product of [the defendant's] free and rational choice." *Humphrey*, 715 A.2d at 1274 (internal quotation marks omitted); *see also Taoussi*, 973 A.2d at 1147. By contrast, a defendant's statement is *involuntary* if it was "extracted from the defendant by coercion or improper inducement, including threats, violence, or any undue influence that overcomes the free will of the defendant." *Humphrey*, 715 A.2d at 1274; *see also Taoussi*, 973 A.2d at 1147.

 In making our *de novo* determination with respect to the voluntariness of a confession, this Court examines the "totality of the circumstances surrounding the challenged statement." *Humphrey*, 715 A.2d at 1274; *see also Fare v. Michael C.*, 442 U.S. 707, 724–25, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979); *Taoussi*, 973 A.2d at 1147. In carrying out this final task with respect to the voluntariness issue, we exercise our "independent judgment in determining whether [the] historical facts establish a deprivation of constitutional rights." *Humphrey*, 715 A.2d at 1274.

#### ii. The Case at Bar

 With respect to the first step of the analytical process described in the preceding subsection, we perceive no basis for ruling that the trial justice's findings of historical fact were clearly erroneous. The trial justice made a number of credibility assessments, and it is a basic principle of our judicial system that such assessments are due deference when reviewed by this Court. As we have said, "[we afford] a great deal of respect to the factual determinations and credibility assessments made by the judicial officer who has

actually observed the human drama that is part and parcel of every trial and who has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." *State v. DiCarlo*, 987 A.2d 867, 872 (R.I.2010) (internal quotation marks omitted). The trial justice was "in the best position to assess the relative credibility of witnesses." *See State v. DeOliveira*, 972 A.2d 653, 662 (R.I. 2009).

In the instant case, the trial justice found the testimony of defendant to be not at all credible. After a thorough review of the testimony given at the suppression hearing, we cannot say that the findings of fact by the trial justice were clearly erroneous. Accordingly, we next proceed to review *de novo* the question of the voluntariness of defendant's confession based on the totality of the circumstances surrounding the challenged statements.

Accepting the factual findings and credibility determinations of the trial justice, as we have done in the instant case, there is nothing left to support an argument that defendant's inculpatory statements were involuntary. Accordingly, having scrutinized the record in a *de novo* manner, we have reached the same conclusion as did the trial justice—*viz.*, that Mr. Barros's confession was voluntary and was made after a knowing and intelligent waiver of his constitutional rights.

The defendant knowingly and intelligently waived his rights when he first met with Detective Fallon, just hours after his arrest. The next morning, the ATF agents and Detective O'Connell all confirmed with defendant that he understood his rights and was willing to speak with them. At no time during the course of defendant's interrogation did he indicate that he no longer wished to speak with the

detectives and the ATF agents or that he wished the interrogation to cease so that he could consult an attorney.

Based upon our own review of the record of the suppression hearing, we are fully satisfied as to the voluntary nature of defendant's incriminating statements. As an initial matter, we address the effect of handcuffing defendant's hand to the wall. As we expressly held in *State v. Humphrey*, 715 A.2d 1265 (R.I.1998), and recently reiterated in *State v. Robinson*, 989 A.2d 965 (R.I.2010), such a practice does not negate the voluntariness of a confession. We are unable to perceive any meaningful basis for departing from the rationale of *Humphrey*, and we consider the holding in that case to be dispositive with respect to the handcuff issue in this case. We also dismiss the contention that any alleged threats or any alleged promises of leniency made by the agents and detectives rendered defendant's confession involuntary. *See Apalakis*, 797 A.2d at 448 ("It is well established that law enforcement agents do not automatically exceed the bounds of permissible police conduct by telling a suspect that his or her cooperation would be 'helpful' or that a confession would 'make it better.' ").

What remains of defendant's argument on appeal is an assertion that defendant's testimony should have been deemed credible whereas the testimony of witnesses for the prosecution should not have been deemed credible. As nothing in our review of the record suggests that the trial justice's findings of historical fact were clearly erroneous, our *de novo* review of the record based on the totality of the circumstances leads us to the firm conclusion that defendant's statements and confession were the product of his free and rational choice and therefore were voluntary. *See Bido*, 941 A.2d at 836; *Humphrey*, 715 A.2d at 1274. Since Mr. Barros

made a knowing and intelligent waiver of his *Miranda* rights, it was not error for the trial justice to deny his motion to suppress.

### 5. Prompt Presentment

■ The defendant also argues that it was error to deny his motion to suppress because his statements were the product of a failure to promptly present him before a judicial officer.

■ Rule 5(a) of the Superior Court Rules of Criminal Procedure reads in pertinent part as follows:

> "Any person making an arrest without a warrant shall take the arrested person without unnecessary delay before a judge of the District Court for the division in which the arrest was made or in which the crime was committed. * * * Whenever an arrest shall be made, the arrested person shall be afforded a prompt hearing for the purpose of admission to bail before a judge of the District Court or an officer authorized to bail persons * * *."

In our recent opinion in *State v. King*, 996 A.2d 613 (R.I.2010), we stated that Rule 5(a) is "not a constitutional command to be found within the text of our Federal or State Constitutions, and its breach does not necessarily create any constitutional violation." *King*, 996 A.2d at 621 (quoting *State v. Nardolillo*, 698 A.2d 195, 199 (R.I. 1997)). Instead, this Court views Rule 5(a) as "a prophylactic measure designed to prevent other constitutional infirmities." *King*, 996 A.2d at 621.

■ In interpreting Rule 5(a), this Court has held that "delay in presentment, without more, does not warrant automatic suppression of a statement made during the period of delay." *King*, 996 A.2d at 622. Rather, we have held that "delay, if it is to render a confession inadmissible, *must have been operative in inducing the*

*confession." Id.* at 622 (quoting *State v. Lionberg,* 533 A.2d 1172, 1178 (R.I.1987)) (emphasis in original); *see also Nardolillo,* 698 A.2d at 199. We have similarly stated that, in making the determination as to whether or not the delay was operative in inducing the confession, a hearing justice "must consider whether the time preceding a suspect's statement had any *causative effect* upon his [or her] * * * decision to confess." *King,* 996 A.2d at 622 (brackets, omission, and emphasis in original) (internal quotation marks omitted); *see also Nardolillo,* 698 A.2d at 199; *State v. Ferola,* 518 A.2d 1339, 1344 (R.I.1986) (stating that the court must "consider whether the so-called delay in bringing the defendant before a judicial officer in any way *prompted* [the defendant] to give the police his inculpatory statement") (emphasis added) (internal quotation marks omitted); *State v. Cobb,* 494 A.2d 1182, 1185 (R.I.1985). Accordingly, "the elapsed time between the defendant's arrest and his confession is the critical period [that] we must examine and scrutinize in order to determine if it had been *operative in inducing* the defendant's admissions." *King,* 996 A.2d at 622 (emphasis in original) (quoting *Nardolillo,* 698 A.2d at 199); *see also State v. Brown,* 898 A.2d 69, 78 (R.I.2006); *State v. Johnson,* 119 R.I. 749, 756, 383 A.2d 1012, 1017 (1978).

In summary, our well-settled case law with respect to Rule 5(a) unambiguously indicates that a defendant who seeks to have an inculpatory statement suppressed because of an unnecessary delay in presentment "must demonstrate *both:* (1) that the delay in presentment was unnecessary *and* (2) that such delay was 'causative' with respect to" the making of the inculpatory statement. *King,* 996 A.2d at 622.

In the instant case, the trial justice ruled that any delay in presentment was not operative in inducing defendant's confession; rather, he found that defendant "was very much overcome by the knowledge of his good friend Sim[s]'s death, and [this] state of upset clearly led to his desire to unburden himself." Our careful review of the record in this case has led us to the same conclusion: there was *no causal nexus* between any alleged delay in presentment (whether necessary or unnecessary) and defendant's decision to speak with the Providence detectives and the ATF agents, to volunteer information to them, and ultimately to provide them with a confession. In other words, there is nothing in the record before us to suggest that any delay in presentment had any causative effect with respect to defendant's statements and confession.

We are further unable to view the circumstances of the interview on the morning of December 30 as demonstrating a "police tactic of delay designed to produce an involuntary or unwitting confession"—Rule 5(a) having been enacted in order to militate against the use of such tactics. *See Nardolillo,* 698 A.2d at 200; *see also State v. Robinson,* 658 A.2d 518, 521 (R.I.1995). ATF Agent West initiated his interview of Mr. Barros so as to obtain information regarding where defendant had procured the gun that was in his possession when he was arrested. There is absolutely no evidence in the record indicating that the investigators induced defendant to make the inculpatory statements that he made relative to his relationship with Mr. Sims and the criminal acts in which the two engaged; actually, it is clear from the record that those statements were unanticipated by the investigators.

Since it is clear to us that the timing of defendant's presentment was not in any way operative in inducing defendant to speak freely with Detective O'Connell and

the ATF agents, we need not pass upon the precise date of defendant's arrest, whether there was any delay in presentment, and whether any such delay was unnecessary. *See King*, 996 A.2d at 622. Accordingly, we are in agreement with the trial justice that the delay, if any, in presentment of defendant was not "operative in inducing" him to make his statements or his confession. *See Nardolillo*, 698 A.2d at 199.

## B

### The Third–Party–Perpetrator Evidence

The defendant also contends on appeal that the trial justice erred when he ruled that the defense would not be permitted to cross-examine Detective O'Connell with respect to a statement made to the detective which suggested that one or more third parties may have had a motive to perpetrate the murder of Deivy Felipe. We first briefly summarize the relevant facts.

The day after Deivy Felipe was found shot to death, Detective O'Connell interviewed and took a written statement from one Ana Roca—the woman with whom Mr. Felipe had been living prior to his murder.[19] In that statement, Ms. Roca told the police that, at some point between August 2004 and January 2005, the tenants who lived on the first floor of the building in which she and Mr. Felipe lived had hosted a party. Ms. Roca indicated in her statement that, during that party, Mr. Felipe fought with several of the guests, stabbed four of them, and smashed a bottle over one person's head. She stated that, about a week after the party, "the windows of [her] car were smashed." Ms. Roca also stated that one of the first-floor tenants told her that Mr. Felipe was

"wanted" because he had stabbed the four guests at the just-referenced party; according to Ms. Roca, the tenant added that the individuals who had been stabbed had not reported the incident to the police.

Ms. Roca further indicated in her statement that Mr. Felipe had been so concerned about the individuals who had been involved in the fight at the party that he left Providence and lived in New York from December 2004 to January 2005 in the hope that "things [would] cool off." However, according to Ms. Roca's statement to Detective O'Connell, Mr. Felipe continued to be in fear of the same individuals once he had returned to Providence; she said that he had indicated to her that he wanted to obtain a gun because he kept encountering them. Ms. Roca also stated to the detective that, a few weeks prior to his death, Mr. Felipe had started to sell drugs; she told the detective that many people owed Mr. Felipe money in connection with drug sales.

By the time of defendant's second trial, the defense continued to be unable to locate Ana Roca to testify at trial regarding the contents of her statement to the police. For its part, the prosecution filed a motion *in limine* prior to the second trial whereby it sought to preclude defense counsel from asking Detective O'Connell detailed questions about Ms. Roca's statement. The trial justice ruled that, although a criminal defendant is entitled to present a defense that implicates another person, Mr. Barros had failed to make the reasonably specific offer of proof that our case law requires.

In reviewing the trial justice's *in limine* ruling that defense counsel would not be permitted to cross-examine Detective O'Connell about certain statements made to him by Ms. Roca as part of a third-

19. The record is not clear as to whether Ana Roca was Mr. Felipe's girlfriend or his wife, but it is undisputed that they were living together at the time of his death.

party-perpetrator defense, it is our duty to consider whether the evidence at issue was erroneously excluded—and, if so, whether that exclusion was sufficiently prejudicial to constitute reversible error. *See State v. Gomes,* 881 A.2d 97, 111 (R.I.2005).

It is a self-evident proposition that "an appropriate defense to a charge of criminal misconduct is that another person was the true perpetrator of the crime." *State v. Wright,* 817 A.2d 600, 609 (R.I. 2003); *see also Gomes,* 881 A.2d at 111 ("There is no question that a defendant is entitled to present a defense that implicates another person."). At the same time, however, this Court has repeatedly indicated that when a criminal defendant wishes to mount such a third-party-perpetrator defense, the defendant must make an offer of proof that is *reasonably specific. Gomes,* 881 A.2d at 111; *see also State v. Scanlon,* 982 A.2d 1268, 1275 (R.I.2009); *State v. Gazerro,* 420 A.2d 816, 824–25 (R.I.1980).

Such a "reasonably specific" offer of proof to the effect that another person had a motive to commit the crime with which a defendant is charged must not only allude to the motive but must also point to "evidence tending to show the third person's opportunity to commit the crime and a proximate connection between that person and the actual commission of the crime." *Gazerro,* 420 A.2d at 825; *see also Gomes,* 881 A.2d at 111; *Wright* 817 A.2d at 610; *State v. Brennan,* 526 A.2d 483, 488 (R.I.1987).

A review of the record reveals that, in making his offer of proof, defense counsel focused almost entirely on the *motive* of the unnamed individuals referred to in Ms. Roca's statement to Detective O'Connell. It is apparent that he offered absolutely no evidence (1) to establish that the individuals to whom Ms. Roca referred in her statement had an *opportunity* to commit the crime or (2) to establish a *proximate connection* between these individuals and the murder of Deivy Felipe. On appeal, defendant simply suggests that "in the unique circumstances of this case," in which (in defendant's view) the existence of third parties with a motive and opportunity is not in doubt but the identity of those individuals is unknown, we should not strictly apply our long-standing criteria with respect to third-party-perpetrator evidence. It is clear to us, however, that those criteria should not be disregarded in this case; to do so would constitute "an impermissible invitation to the jury to speculate on a collateral matter." *See Gazerro,* 420 A.2d at 825; *see also Scanlon,* 982 A.2d at 1275; *Gomes,* 881 A.2d at 112. We have repeatedly insisted that offers of proof in this area be *reasonably specific* in order to ensure that there not be such speculation by the jury, and we are unconvinced that we should depart from that salutary rule.

The trial justice did not err in granting the prosecution's motion *in limine* to preclude the admission of the third-party-perpetrator evidence.

## III

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to that tribunal.

Chief Justice SUTTELL, concurring.

I write separately to signify my earnest endorsement of Justice Flaherty's comments concerning the myriad benefits to the criminal justice system resulting from the electronic recording of police interrogations. It is a practice greatly to be encouraged.

I believe that it is neither necessary nor prudent, however, for this Court to exercise its supervisory authority at this time to mandate that a trial justice give any particular instruction in this regard. As the majority suggests, the fact that law enforcement declined to record an interrogation when it had the capability of doing so is a circumstance that may be developed at trial by counsel and effectively argued to a jury. Moreover, the defendant in this case requested two specific jury instructions, neither of which in my judgment was appropriate.

Accordingly, I support my dissenting colleague's predilection for electronic recording but fully concur with the majority opinion.

Justice FLAHERTY, dissenting in part and concurring in the result.

There can be no more powerful evidence in a criminal trial than a defendant's admission that he is guilty of the crime with which he is charged. A confession packs an intellectual and emotional wallop, and once it is submitted to a fact-finder, the focus predictably shifts from the guilt or innocence of the accused to whether the statement was voluntary. It is precisely because of the potency of such admissions that law enforcement officers work so hard to obtain them, employing, as they should, sophisticated techniques designed to draw concessions from suspects. Invariably, jurors are tasked with determining whose story to believe: the police, who categori-

cally say that the accused was calm, comfortable, and subjected to no inappropriate physical or emotional pressure, or the defendant, who often complains of emotional browbeating and physical deprivation.

I respectfully dissent from the majority's decision to decline to require that a cautionary instruction be given whenever the prosecution attempts to meet its evidentiary burden by relying on an unrecorded, or partially recorded, custodial interrogation. Specifically, I would hold that when a suspect is interrogated in a detention setting for a crime punishable by imprisonment for life, and law enforcement has the capability to video record the interrogation but declines to do so, the jury should be informed by instruction that this was so, if such an instruction is requested by the defendant.[20]

## A Tradition of Concern Surrounding Custodial, Detention–Centered Interrogation

Ascertaining the essential truth of the circumstances surrounding a custodial, detention-centered interrogation long has presented the criminal justice system with unique challenges. As far back as 1936, the United States Supreme Court articulated deep concern in its seminal decision, *Brown v. Mississippi*, in which the Court acknowledged:

"Coercing the supposed state's criminals into confessions and using such confessions so coerced from them against them

---

**20.** The defendant in this case proffered two suggested jury instructions. One, modeled on the instruction required by Rule 3:17 of the New Jersey Rules Governing Criminal Practice, concludes that the absence of the required recording "permits but does not compel [a jury] to conclude that the State has failed to prove that oral admissions were in fact made and if so, was accurately reported by State's witnesses." The other was based on the Massachusetts instruction laid out by

the Supreme Judicial Court in *Commonwealth v. DiGiambattista*, 442 Mass. 423, 813 N.E.2d 516, 533–34 (2004). That proffered instruction said, in part, that "[t]he absence of an electronic recording of an interrogation in its entirety permits (but does not compel) [the jury] to conclude that State has failed to prove voluntariness beyond a reasonable doubt, which in this context is a heavy burden." I do not, by this dissent, specifically endorse either of these approaches.

in trials has been the curse of all countries. It was the chief iniquity, the crowning infamy of the Star Chamber, and the Inquisition, and other similar institutions. The Constitution recognized the evils that lay behind these practices and prohibited them in this country. * * * The duty of maintaining constitutional rights of a person on trial for his life rises above mere rules of procedure, and wherever the court is clearly satisfied that such violations exist, it will refuse to sanction such violations and will apply the corrective." *Brown v. Mississippi*, 297 U.S. 278, 287, 56 S.Ct. 461, 80 L.Ed. 682 (1936) (quoting *Fisher v. State*, 145 Miss. 116, 110 So. 361, 365 (1926)).

The challenge of balancing the rights of defendants, the evidence-collecting responsibilities of law enforcement and prosecutors, and the truth-seeking goals of judges and juries has been a moving target. Since *Brown* (and without doubt before *Brown*), courts have struggled to maintain an appropriate balance between these interests in myriad contexts. The increased availability and ease of use of advanced technology has altered that balance still more.

### State–Based Evolution: Custodial, Detention–Centered Interrogation and Technology

As eloquently outlined by the majority, the first state court to require electronic recording of detention-centered interrogations was the Alaska Supreme Court, which, in 1985, found electronic recording (either by audio or video tape) to be a due-process right under that state's constitution. *Stephan v. State*, 711 P.2d 1156, 1158 (Alaska 1985). Other states that have analyzed the issue have declined to conclude, and I agree, that such a right is founded on due-process principles.[21] However, several states have reached the same result, basing their analyses on principles of fairness or justice.[22]

Moreover, several state courts have held that recording confessions promotes or even ensures accuracy. *See, e.g., State v. Sawyer*, 561 So.2d 278, 280 (Fla.Dist.Ct. App.1990) (commending police department "in its practice of maintaining a record of interrogations through the use of tape recording" and "recommend[ing] this practice to all other law enforcement agencies so that challenges to future confessions can be exposed to the light of truth"); *Lara v. State*, 25 P.3d 507, 511 (Wyo.2001) (noting that "tape-recorded interviews [ ] leave far fewer loose ends to be tied up and in many, if not most, instances would be a well-advised protocol to follow").

It is significant that most courts that have considered the merits of electronic recording have concluded that adopting the practice significantly improves the criminal justice system, and specifically, the ability of judges and juries to get to the truth.[23] *See, e.g., United States v.*

---

**21.** The rejection of a due-process approach by numerous jurisdictions was reviewed comprehensively by the Connecticut Supreme Court in its decision in *State v. Lockhart*, 298 Conn. 537, 4 A.3d 1176, 1188–89 n. 10 (2010).

**22.** Minnesota was the first state to rely on this approach in its decision in *State v. Scales*, 518 N.W.2d 587 (Minn.1994). There, the court held that the "fair administration of justice" requires that all custodial interrogations should be electronically recorded when feasi-

ble, and must be recorded when the questioning occurs at a place of detention. *Id.* at 592. Several states subsequently have adopted this reasoning. *See, e.g., DiGiambattista*, 813 N.E.2d at 533–34; *State v. Barnett*, 147 N.H. 334, 789 A.2d 629, 632–33 (2001); *State v. Cook*, 179 N.J. 533, 847 A.2d 530, 545–47 (2004).

**23.** Stakeholders that have used electronic recordings have cited numerous benefits. *See* Thomas P. Sullivan, *Recording Federal Custo-*

*Torres–Galindo*, 206 F.3d 136, 144 n. 3 (1st Cir.2000) ("[T]here is little doubt that accurate, contemporaneous recording of custodial statements would facilitate the truth-seeking aims of the justice system, and it would also facilitate review on appeal"); *Jimenez v. State*, 105 Nev. 337, 775 P.2d 694, 696 (1989) (finding that recordings "would alleviate the problems of credibility of police officers who claim a defendant made incriminating statements"); *State v. Godsey*, 60 S.W.3d 759, 772 (Tenn. 2001) ("There can be little doubt that electronically recording custodial interrogations would reduce the amount of time spent in court resolving disputes over what occurred during the interrogation."); *State v. Kilmer*, 190 W.Va. 617, 439 S.E.2d 881, 893 (1993) (opining that recording would benefit law enforcement, the suspect, and the court).

There can be no question that as courts and legislatures engage in the continuing work of providing for a just determination in every criminal proceeding, there has been a concomitant trend to require that the interrogations of suspects be recorded. Indeed, since Alaska's adoption of the practice a quarter of a century ago, fourteen states and the District of Columbia now require law-enforcement personnel to record some or all custodial interviews. The legislatures and the courts of our sister states that have traveled that path have expressed a preference that confessions be recorded through the development of sundry procedures that encourage or mandate such recordings. Those preferences have ranged from (1) a statement by the court of its preference for electronic recording of detention-based custodial interrogations,[24] (2) a statute requiring a jury instruction that a jury may presume involuntariness from the absence of a recording, complete or otherwise,[25] (3) a presumption of inadmissibility when the custodial interrogation is not recorded in its entirety,[26] (4) a presumption of admissibility when the custodial interrogation is recorded in full,[27] (5) a jury instruction con-

---

*dial Interviews*, 45 Am.Crim. L.Rev. 1297, 1306–10 (2008). Recording reduces pretrial motions and increases pleas of guilty; it protects police from false accusations of improper conduct or allegations that they are misstating what occurred during interrogations; it helps expose and deter improper conduct, and prosecution and potential wrongful convictions of innocent suspects; it allows judges and juries to see and hear what truly occurred rather than relying on the recollections of witnesses after the passage of time; it enhances the public's confidence in law enforcement and the criminal justice system. *Id.*

**24.** *State v. Hajtic*, 724 N.W.2d 449, 456 (Iowa 2006) ("We believe electronic recording, particularly videotaping, of custodial interrogations should be encouraged, and we take this opportunity to do so.").

**25.** *See* North Carolina, N.C. Gen.Stat. Ann. § 15A–211(f)(3) (West 2008) ("When evidence of compliance or noncompliance with the requirements of this section has been presented at trial, the jury shall be instructed that it may

consider credible evidence of compliance or noncompliance to determine whether the defendant's statement was voluntary and reliable.").

**26.** *See* Illinois, 725 Ill. Comp. Stat. 5/103–2.1 (2005) (Requiring electronic recordation of custodial interrogations of both minors and adults conducted in places of detention, and creating a presumption of inadmissibility as evidence against the accused in enumerated proceedings of the Illinois Criminal Code).

**27.** *See* Ohio, Ohio Rev.Code Ann. § 2933.81(B) (2010) ("All statements made by a person who is the suspect of a violation of or possible violation of * * * a felony of the first or second degree, * * * during a custodial interrogation in a place of detention are presumed to be voluntary if the statements made by the person are electronically recorded.").

veying that a jury should evaluate with particular caution an alleged statement or confession made at a place of detention and derived from an unrecorded interrogation.[28] Significantly, many law enforcement agencies across the country record such interviews as a matter of sound policy and best practice.[29]

**Oversight Responsibility for the Fair Administration of Justice Obligates this Court to Exercise its Supervisory Authority**

It is almost axiomatic that the prosecution generally will prevail when the defendant is directly pitted against the police in a "swearing contest" with respect to what occurred during an interrogation resulting in a confession. *See Stephan*, 711 P.2d at 1158 n. 6. On the other hand, the growing proliferation of recording devices as part of our daily lives presents palpable risks to law enforcement. On this point, the Iowa Supreme Court recently opined:

"Commentators, and the American Bar Association, have advocated videotaped recording of custodial interrogations. *See* Steven A. Drizin & Marissa J. Reich, *Heeding the Lessons of History: The Need for Mandatory Recording of Police Interrogations to Accurately Assess the Reliability and Voluntariness of Confessions*, 52 Drake L.Rev. 619, 619–46 (2004). As these authors have stated,

'failing to record police interrogations may no longer be a luxury that police officers can afford. We live in a video age, an age when satellites can track our every movement and when cameras are in our banks, in our stores, on our roads, and in our homes. Most of the citizens who make up the jury pool either have or will soon have video or digital cameras of their own. In this context, it is becoming increasingly difficult for jurors to accept the assertions of police officers that they did not tape interrogations because it was not their policy to do so. In the post-DNA age, when every wrongful conviction is front-page news, and police officers and prosecutors are being asked to explain what went wrong in each of these cases, police officers may have to start recording interrogations as a matter of self-preservation. Their failure to do so will, as the reformers suggested, breed distrust in their methods and cause a strain in their relations with the public.' " *State v. Hajtic*, 724 N.W.2d 449, 455–56 (Iowa 2006) (quoting Drizin & Reich, 52 Drake L.Rev. at 638–39).

And therein lies the rub. There is no question that there may be a multitude of valid reasons why law enforcement does not record a suspect's confession. These may range from an experienced interrogator's judgment that the suspect will not talk if he is being recorded, to the flat refusal of a person being interrogated to give a recorded statement. However, despite such valid potential reasons, it is the fact-finder who carries the burden of adjudging the voluntariness of the statement, and the fact-finder is entitled to the best and highest quality of evidence, or an ex-

---

**28.** *See DiGiambattista*, 813 N.E.2d at 533; *see also* Mont.Code Ann. §§ 46–4–408 to 410 (2009) (requiring electronic recordation of custodial interrogations, setting forth exceptions to the recordation requirement, and providing that "[i]f the defendant objects to the introduction of evidence under *46–4–408* and the court finds by a preponderance of the evidence that the statements are admissible, the judge shall, upon motion of the defendant, provide the jury with a cautionary instruction").

**29.** Sullivan, 45 Am.Crim. L.Rev. at 1337–41 (Appendix A).

planation why it was not presented to it. And it is this Court's responsibility, under its supervisory authority, to aid the factfinder in its search for the truth.

## The Humane Practice Rule Should Not Be Relied Upon as an Exclusive Safeguard of Voluntariness

The majority has set forth correctly, and with admirable clarity, this state's long adherence to the Humane Practice Rule, which "requires that judge and jury make separate and independent determinations of voluntariness." *State v. Dennis*, 893 A.2d 250, 262 (R.I.2006). However, I respectfully disagree with the majority's holding that this is a sufficient safeguard, and I also disagree with its averment that it is "satisfied that juries in this state routinely receive adequate instructions with respect to the voluntariness *vel non* of custodial interrogations—most notably because of · our Humane Practice Rule." Although it certainly is true that the Humane Practice Rule does provide a valuable safeguard, I cannot accept that fairness—especially in cases involving investigation of a crime punishable by life imprisonment—is conclusively resolved when balanced against the generally accepted observation that "[l]istening to a defendant be inculpated by his or her own voice has a persuasive power unrivaled by contradictory testimonial evidence." *State v. Barnett*, 147 N.H. 334, 789 A.2d 629, 632 (2001); *accord Commonwealth v. DiGiambattista*, 442 Mass. 423, 813 N.E.2d 516, 533 (2004) (characterizing confessional evidence as being of an "exceptionally potent quality"). Furthermore, and especially in light of the ease of access to recording technology in today's society, it is my opinion that the Humane Practice Rule should not be relied on as the sole standard for a determination of voluntariness.[30]

The position that our Humane Practice Rule—without any accounting for the realities of contemporary technologies—is sufficient to advance the truth-seeking function of justice as it relates to a determination of voluntariness is needlessly static. Indeed, whether by judicial interpretation or legislative action, other states that employ the Humane Practice Rule (or its relative equivalent under a different name)[31] have advanced their truth-seeking practices by employing new technology in concert with the Humane Practice Rule, and not as a substitute for it. These jurisdictions include Maryland (Md.Code Ann., Crim. Proc. § 2–402(1) (2008) (requiring that "a law enforcement unit that regularly utilizes one or more interrogation rooms capable of creating audiovisual recordings of custodial interrogations shall make reasonable efforts to create an audiovisual recording of a custodial interrogation of a criminal suspect in connection with a case involving" named felonies "whenever possible")); Massachusetts (*DiGiambattista*, 813 N.E.2d at 533 (holding that the defendant, when requested, is entitled to a jury instruction explaining that "the State's highest court has expressed a preference that such interrogations be recorded whenever practicable")); Missouri (Mo. Ann. Stat., ch. 590.700 (West 2009) (requiring the recording of custodial interviews of suspects of specified felonies if recording equipment is available and

---

**30.** *See DiGiambattista*, 813 N.E.2d at 539 (Spina, J., dissenting) ("[O]ur 'humane practice' rule ensures greater safeguards for defendants than those provided by many other jurisdictions.").

**31.** *See Jackson v. Denno*, 378 U.S. 368, 378–79 n. 9, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (discussing the difficulty of applying a tidy term of art to the procedural safeguard).

recording is feasible)); Nebraska (Neb. Rev.Stat. Ann. § 29–4501 to § 29–4508 (LexisNexis 2008) (§ 29–4504 says, "a court shall instruct the jury that they may draw an adverse inference for the law enforcement officer's failure to comply with [§ 29–4503].")); New Mexico (N.M. Stat. Ann. § 29–1–16 (2005) (requiring detention-centered electronic recordation in its entirety if reasonably available unless good cause is shown for not recording)), and Oregon (Or.Rev.Stat. § 133.400(3) (2010) ("upon the request of the defendant, the court shall instruct the jury regarding the legal requirement described in subsection (1) of this section and the superior reliability of electronic recordings when compared with testimony about what was said and done")).[32]

Thus, it cannot be maintained that the contemporary and ever-widening use of available technology to mitigate the serious dangers of involuntary confessions occurring in detention-based interrogations is limited to those states that lack the safeguards provided by the Humane Practice Rule or its relative equivalent. Rather, the actions of the six states enumerated above demonstrate that the Humane Practice Rule's dual-tier review of voluntariness is not in and of itself a sufficient prophylactic to the extent that we can confidently ignore the additional protections provided by the widespread availability and ease of use of highly reliable recording technologies.

Although I agree that the dual-tiered review provided by the Humane Practice Rule increases the likelihood that the voluntariness of a defendant's confession will be fully considered by the fact-finders, it does nothing to ensure that the quality of the evidence reviewed by judge and jury is the best available. By encouraging recordings of custodial, detention-centered interrogations, this Court would not undermine the Humane Practice Rule, but would in fact enhance it by providing judges and juries with the most accurate representation of a defendant's proffered confession.

## Summation of Dissent

Therefore, for the aforementioned reasons, I respectfully dissent from the majority's determination that this case does not require this Court to address the jury instruction issue raised in this appeal. In cases in which a confession to a crime punishable by imprisonment for life is garnered in a detention setting, justice is best served if the trial justice, upon request, instructs the jury that it may consider that the police had the opportunity to video record the confession but did not do so. Although a recording requirement may be an eventual step taken by more courts and legislatures, the step herein advocated— that the jury be informed by the court when law enforcement had the ability to contemporaneously record a detention-centered interrogation and chose not to do so—does not overreach or risk uncertain footing. In my opinion, it would provide the jury with a helpful general guideline designed to do no more than assist the trier-of-fact who is burdened with the responsibility for truth-seeking.

## Applicability to this Case

Despite my disagreement with the Court's reasoning with regard to the re-

---

**32.** For cases pertaining to adoption of the Humane Practice Rule or its relative equivalent, see *Dempsey v. State*, 277 Md. 134, 355 A.2d 455, 461 (1976); *Commonwealth v. Marshall*, 338 Mass. 460, 155 N.E.2d 798, 800 (1959); *State v. Washington*, 399 S.W.2d 109, 114 (Mo.1966); *State v. Scott*, 200 Neb. 265, 263 N.W.2d 659, 663 (1978); *Pece v. Cox*, 74 N.M. 591, 396 P.2d 422, 423 (1964); and *State v. Brewton*, 238 Or. 590, 395 P.2d 874, 880 (1964).

cording of the confession, I nonetheless would affirm the judgment of conviction in this case. Here, the defendant was not being interrogated at the police station for a crime punishable by life imprisonment, but rather for a weapons offense. Indeed, the record reveals that the Providence police brought in agents from the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives for that reason. The only fair conclusion that can be drawn from the record is that the interrogating officers were surprised when the defendant blurted out his involvement in a homicide when he was informed of the murder of his friend, Tonea Sims ("Nutt").

Under the circumstances in this case, the surprised officers should have had no obligation to stop the proceedings to obtain a video recording before continuing with the interview of the defendant.