# IN THE SUPREME COURT OF IOWA

No. 32 / 03-1481

Filed December 1, 2006

**STATE OF IOWA**,

Appellee,

vs.

**ARIF HAJTIC**,

Appellant.

---

Appeal from the Iowa District Court for Black Hawk County, James L. Beeghly and Todd A. Geer, Judges.

Defendant appeals from judgment and sentence for three counts of third-degree burglary under Iowa Code section 713.6(A) (2001) and one count of first-degree robbery under Iowa Code section 711.2. **AFFIRMED.**

James A. Benzoni of Benzoni Law Firm, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Jean C. Pettinger, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and Joel Dalrymple, Assistant County Attorney, for appellee.

**LARSON, Justice.**

Arif Hajtic was convicted of three counts of third-degree burglary under Iowa Code section 713.6A (2001) and one count of first-degree robbery under Iowa Code section 711.2. On appeal, Hajtic claims his statements to the police were improperly admitted, the trial court abused its discretion in consolidating his robbery and burglary trials, and the court erred in denying his motion for judgment of acquittal. We reject all of these arguments, but preserve Hajtic's separate ineffective-assistance-of-counsel claim for possible postconviction relief proceedings.

## I. *Facts and Prior Proceedings.*

Arif Hajtic was arrested in the early morning hours of December 19, 2002, and taken to the Waterloo Police Department for questioning on a series of burglaries and a robbery. Because Hajtic was only seventeen at the time, the police contacted his mother to inform her that he was in custody, in accordance with Iowa Code section 232.11(2). Hajtic and his family were from Bosnia and had been in the United States only about six years. His mother spoke little English, so the police used Hajtic's fourteen-year-old sister, Evlijana, to translate the discussions between the police and Hajtic's mother concerning the mother's consent to Hajtic's waiver of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Hajtic's mother signed a consent form, and Hajtic signed a waiver form. Hajtic confessed to his participation in the burglaries and robbery. According to him, the crimes had been planned and carried out in conjunction with other similar crimes orchestrated by Eric Miller, who testified against Hajtic. On appeal, Hajtic argues that his mother's consent to his *Miranda* waiver was invalid because his sister, as interpreter, lacked an understanding of the concepts of the *Miranda* warning and was therefore unable to convey the information necessary to validate the mother's consent

to Hajtic's waiver. Also, according to Hajtic, his own *Miranda* waiver was invalid. The State counters that the mother's consent to Hajtic's *Miranda* waiver was not required because he was over sixteen. Further, the State argues, Hajtic's own waiver was valid because it was knowingly, voluntarily, and intelligently made. We first address the issue of the mother's consent.

## II. *The Mother's Consent.*

Because Hajtic was a juvenile (seventeen years and eleven months old), he was entitled to the protection of our juvenile laws regarding his right to counsel in the burglary cases. (The robbery charge is a forcible felony and, therefore, not subject to the juvenile code. *See* Iowa Code §§ 232.8(1)(*c*), 702.11; *State v. Harris*, 589 N.W.2d 239, 244 (Iowa 1999).) One of the protections accorded most juveniles is the requirement that a parent consent to a juvenile's waiver of *Miranda* rights. *See* Iowa Code § 232.11(2). The State argues that the mother's consent to Hajtic's waiver was not required because he was over sixteen. Iowa Code section 232.11(1) provides:

> A child shall have the right to be represented by counsel at the following stages of the proceedings within the jurisdiction of the juvenile court . . . :
>
> *a.* From the time the child is taken into custody for any alleged delinquent act that constitutes a serious or aggravated misdemeanor or felony under the Iowa criminal code, and during any questioning thereafter by a peace officer or probation officer.

The crimes with which Hajtic was charged, robbery and burglary, fall under category "*a.*" However, a subsequent provision allows for a juvenile's waiver of counsel without parental consent in some cases. Under section 232.11(2),

> [t]he child's right to be represented by counsel under subsection 1, paragraphs "*b*" to "*f*" of this section shall not be waived by a child of any age. The child's right to be represented by counsel under subsection 1, paragraph "*a*" [the

> class in which this case falls] shall not be waived by a child less than sixteen years of age without the written consent of the child's parent, guardian, or custodian. *The waiver by a child who is at least sixteen years of age is valid only if a good faith effort has been made to notify the child's parent, guardian, or custodian that the child has been taken into custody and of the alleged delinquent act for which the child has been taken into custody, the location of the child, and the right of the parent, guardian, or custodian to visit and confer with the child.*

(Emphasis added.)

When a juvenile is over sixteen, section 232.11 does not require a parent's consent to the juvenile's *Miranda* waiver, but only a good-faith effort to inform the parent (1) that the child is in custody, (2) the nature of the act charged, (3) the location of the child, and (4) the right of the parent to confer with the child. *See* Iowa Code § 232.11(2); *State v. Nelson*, 435 N.W.2d 344, 348 (Iowa 1989); *State v. Means*, 547 N.W.2d 615, 620 (Iowa Ct. App. 1996).

Following a call by the police to Hajtic's home, Hajtic's mother, his fourteen-year-old sister, and a younger brother came to the police station. An officer informed Hajtic's sister of the nature of the charges, so she could translate the information to Hajtic's mother in their Bosnian language. Hajtic's mother was permitted to talk with him before he signed his *Miranda* waiver. This was all captured on a videotape.

The police provided Hajtic's mother with all of the information required by section 232.11(2). The police officer's use of Hajtic's sister to convey to the mother the necessary information constituted a good-faith effort to inform the mother, as required by section 232.11(2). Despite Hajtic's argument that his sister was unable to accurately translate the fine points of a *Miranda* warning, it is clear that his mother was informed that Hajtic was in custody, the nature of the act charged, where Hajtic was being held, and the mother's right to confer with him. Hajtic's mother obviously knew he was in custody because she was there with him. In fact, Hajtic's

mother testified at the suppression hearing, with the aid of an interpreter, that the Waterloo Police Department had informed her that they had Arif in their custody, and that he was suspected of the crimes of burglary and robbery. She further testified that, during the time he was at the police department, she was permitted to talk with him.

In summary, even if Hajtic is correct that his sister did not accurately translate the contents of the *Miranda* warning to his mother, this was not fatal to the State's use of his confession because his mother was given all the information required by Iowa Code section 232.11(2).

### III. *The* **Miranda** *Waiver.*

Hajtic claims his statements to the police were inadmissible because the State failed to show they were made knowingly, intelligently, and voluntarily and that they were not induced by intimidation, coercion, or deception. *See Moran v. Burbine,* 475 U.S. 412, 421, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410, 420-21 (1986); *State v. Countryman,* 572 N.W.2d 553, 559 (Iowa 1997). In assessing the validity of a defendant's *Miranda* waiver, the State bears the burden of proving these factors by a preponderance of the evidence. *State v. Morgan,* 559 N.W.2d 603, 606 (Iowa 1997); *Means,* 547 N.W.2d at 621. Our review of the record on the voluntariness of a confession is de novo, and we make our own evaluation of the circumstances. *Morgan,* 559 N.W.2d at 606; *State v. Vincik,* 398 N.W.2d 788, 789 (Iowa 1987).

In *Miranda,* the Court held that a suspect's waiver of his Fifth Amendment privilege against self-incrimination is valid only if it is made voluntarily, knowingly, and intelligently. 384 U.S. at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d at 706-07. The inquiry into whether a waiver is valid "has two distinct dimensions." *Moran,* 475 U.S. at 421, 106 S Ct. at 1141, 89 L. Ed. 2d at 420-21.

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 2572, 61 L. Ed. 2d 197, 212 (1979)). A written waiver of constitutional rights is not sufficient on its own to establish the waiver as knowing, intelligent, and voluntary. *Vincik*, 398 N.W.2d at 789. However, it is strong proof of its validity. *Fryer v. State*, 325 N.W.2d 400, 409 (Iowa 1982).

Courts use an objective standard to determine whether a defendant's waiver is voluntary, knowing, and intelligent. *Pettyjohn v. United States*, 419 F.2d 651, 654-55 (D.C. Cir. 1969). Factors bearing on voluntariness include the defendant's age, experience, prior record, level of education, and intelligence; the length of time the defendant is detained or interrogated; whether physical punishment was used, including deprivation of food or sleep; the defendant's ability to understand the questions; the defendant's physical and emotional condition and his reaction to the interrogation; whether any deceit or improper promises were used in gaining the admissions; and any mental weakness the defendant may possess. *State v. Hodges*, 326 N.W.2d 345, 348 (Iowa 1982). Obviously, a defendant's alienage and unfamiliarity with the American legal system should be included among these objective factors, given that the ultimate determination of whether a waiver is knowing, intelligent, and voluntary must rest on the totality of the circumstances. *Fare*, 442 U.S. at 725, 99 S. Ct. at 2572, 61 L. Ed. 2d at 212.

We are aided in our de novo review of this case by a complete videotape and audiotape of the *Miranda* proceedings and the interrogation that followed. The videotape shows the officer with his side or back to the camera and Hajtic facing the officer and the camera. Hajtic's sister sat about an arms' length to his right. Their mother and Hajtic's six-year-old brother sat behind them in the interrogation room. The officer read out loud a *Miranda* waiver form, and Hajtic read it for himself. Hajtic said he understood his rights and that he had no questions. He signed the waiver form, which stated that he could "read and understand the English language." His ability to understand English was confirmed by the videotape of the *Miranda* proceedings and the questioning that followed. He showed no reluctance to ask questions if he did not understand. When the officer asked a question confusing to Hajtic, he asked the officer to clarify it, and the officer did so. For the most part, however, the officer's questions were answered responsively and without any reliance for interpretation by his sister. In fact, during the interview, Hajtic appeared almost oblivious to his sister's presence. Judging by Hajtic's actions and responses to the questions, he clearly understood the questions asked.

This case illustrates the value of electronic recording, particularly videotaping, of custodial interrogations. One authority has observed that

> [o]ne way to satisfy the burden [of voluntary waiver] is an audio or video recording of the warning, any waiver, and any questioning made in response, but this is not required as a matter of federal constitutional law and few state courts have made such a requirement.

1 Charles Alan Wright, *Federal Practice & Procedure* § 76.3, at 224 (1999) [hereinafter Wright].

At least two states have required electronic recording of such proceedings. *See, e.g., Stephan v. State*, 711 P.2d 1156, 1160 (Alaska

1985); *State v. Scales*, 518 N.W.2d 587, 592 (Minn. 1994). The eighth circuit has also discussed this practice favorably. *See Hendricks v. Swenson*, 456 F.2d 503, 505-07 (8th Cir. 1972).

The eighth circuit

> suggest[ed] that a videotape is protection for the accused. If he is hesitant, uncertain, or faltering, such facts will appear. If he has been worn out by interrogation, physically abused, or in other respects is acting involuntarily, the tape will corroborate him in ways a typewritten statement would not. Instead of denying a defendant his rights, we believe it is a modern technique to protect a defendant's rights.

*Id.* at 506.

The Alaska Supreme Court went so far as to adopt an exclusionary rule for confessions obtained without electronic recordation, based on the due process provisions of its state constitution. It did so because law enforcement officials and lower courts had not heeded the court's suggestion in earlier cases that custodial interrogations should be recorded when feasible. It stated:

> Such recording is a requirement of state due process when the interrogation occurs in a place of detention and recording is feasible. We reach this conclusion because we are convinced that recording, in such circumstances, is now a reasonable and necessary safeguard, essential to the adequate protection of the accused's right to counsel, his right against self incrimination and, ultimately, his right to a fair trial.

*Stephan*, 711 P.2d at 1159-60 (footnotes omitted).

In discussing the efficacy of videotaping custodial interrogations, one Alaska appeals court judge observed:

> [C]laims [of *Miranda* violations] invariably produce a swearing contest in which defendants claim that they were not afforded their constitutional rights and the police officers claim that they were. Since defendants are interrogated in custody, isolated from anyone other than police officers, they cannot provide independent corroboration of their own testimony regarding what occurred during the interrogation. In a sense then, a tape recording provides an objective means for

evaluating what occurred during interrogation. It also provides the defendant with a means of "cross-examining" his confession . . . . The importance of such a tape recording lies in the fact that trial courts and appellate courts tend to trust police officers' recollections of what occurred at the expense of the criminal defendant's account. Thus, in the absence of a tape recording, the prosecuting authorities invariably win the swearing contest. The heavy burden of proving compliance established by *Miranda* becomes, in practice, no burden at all.

*Harris v. State,* 678 P.2d 397, 414 (Alaska Ct. App. 1984) (Singleton, J., concurring and dissenting) (citation omitted), *overruled by Stephan v. State,* 711 P.2d 1156 (Alaska 1985).

As noted by the Alaska Supreme Court, advantages of videotaping go beyond protection of the defendant's rights:

The recording of custodial interrogations is not, however, a measure intended to protect only the accused; a recording also protects the public's interest in honest and effective law enforcement, and the individual interests of those police officers wrongfully accused of improper tactics. A recording, in many cases, will aid law enforcement efforts, by confirming the content and the voluntariness of a confession, when a defendant changes his testimony or claims falsely that his constitutional rights were violated. In any case, a recording will help trial and appellate courts to ascertain the truth.

*Stephan,* 711 P.2d at 1161.

The Minnesota Supreme Court adopted a rule requiring electronic recording under its supervisory jurisdiction to assure fair trials. *Scales,* 518 N.W.2d at 592. Commentators, and the American Bar Association, have advocated videotaped recording of custodial interrogations. *See* Steven A. Drizin & Marissa J. Reich, *Heeding the Lessons of History: The Need for Mandatory Recording of Police Interrogations to Accurately Assess the Reliability and Voluntariness of Confessions,* 52 Drake L. Rev. 619, 619-46 (2004). As these authors have stated,

failing to record police interrogations may no longer be a luxury that police officers can afford. We live in a video age, an age when satellites can track our every movement and when cameras are in our banks, in our stores, on our roads, and in

our homes. Most of the citizens who make up the jury pool either have or will soon have video or digital cameras of their own. In this context, it is becoming increasingly difficult for jurors to accept the assertions of police officers that they did not tape interrogations because it was not their policy to do so. In the post-DNA age, when every wrongful conviction is front-page news, and police officers and prosecutors are being asked to explain what went wrong in each of these cases, police officers may have to start recording interrogations as a matter of self-preservation. Their failure to do so will, as the reformers suggested, breed distrust in their methods and cause a strain in their relations with the public.

*Id.* at 638-39.

In addition, the American Bar Association has endorsed the concept of videotaping. The official ABA policy states:

RESOLVED, That the American Bar Association urges all law enforcement agencies to videotape the entirety of custodial interrogations of crime suspects at police precincts, courthouses, detention centers, or other places where suspects are held for questioning, or, where videotaping is impractical, to audiotape the entirety of such custodial interrogations.

FURTHER RESOLVED, That the American Bar Association urges legislatures and/or courts to enact laws or rules of procedure requiring videotaping of the entirety of custodial interrogations of crime suspects at police precincts, courthouses, detention centers, or other places where suspects are held for questioning, or, where videotaping is impractical, to require the audiotaping of such custodial interrogations, and to provide appropriate remedies for non-compliance.

American Bar Association Report to the House Delegates (Feb. 2004), available at http://www.abanet.org/leadership/2004/recommendations/8a.pdf.

We believe electronic recording, particularly videotaping, of custodial interrogations should be encouraged, and we take this opportunity to do so. In this case, the videotape of Hajtic's confession and the *Miranda* warnings that preceded it clearly show that he understood the *Miranda* warnings given to him and the questions asked. Further, there is no indication the officer made improper promises or threats. Our conclusion that Hajtic

understood the nature of the rights waived and the questions asked is bolstered by other evidence: he lacked only one month of being eighteen and had been in this country for six years. He had attended Waterloo schools until the eleventh grade, and he was able to hold down a job. A jailer who conversed with Hajtic on a daily basis testified he had no trouble communicating with him. Further, Hajtic testified at the suppression hearing in a coherent and understanding manner without an interpreter, although one was in court and available to him.

On our de novo review of the record, we conclude that Hajtic's waiver of his *Miranda* rights was valid, and his confession was voluntarily, knowingly, and intelligently made. The confession was therefore properly admitted, and we affirm on that issue.

### IV. *Sufficiency of the Evidence.*

Hajtic argues that, because his confession was not admissible, his conviction was supported only by the testimony of Eric Miller, an accomplice. Under Iowa Rule of Criminal Procedure 2.21(3),

> [a] conviction cannot be had upon the testimony of an accomplice or a solicited person, unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

Because we have rejected the underlying premise of Hajtic's argument, i.e., that the confession was inadmissible, we reject this argument. There was clearly sufficient evidence to support the verdict when we consider the testimony of Eric Miller together with Hajtic's confession.

### V. *The Consolidation Argument.*

Hajtic complains that the court should not have consolidated his trial on the burglary and robbery charges. Under Iowa Rule of Criminal Procedure 2.6(1),

[t]wo or more indictable public offenses which arise from the same transaction or occurrence or from two or more transactions or occurrences constituting parts of a common scheme or plan, when alleged and prosecuted contemporaneously, shall be alleged and prosecuted as separate counts in a single complaint, information or indictment, unless, for good cause shown, the trial court in its discretion determines otherwise. Where a public offense carries with it certain lesser included offenses, the latter should not be charged, and it is sufficient to charge that the accused committed the major offense.

Our review of a district court's consolidation order is for abuse of discretion. *See State v. Thornton,* 506 N.W.2d 777, 779 (Iowa 1993). To show the district court abused its discretion in consolidating, a defendant must prove that his interest in severance was greater than the State's interest in judicial economy. *State v. Lam,* 391 N.W.2d 245, 251 (Iowa 1986).

A "common scheme or plan" under rule 2.6(1) requires "that all offenses charged be products of a single or continuing motive." *Lam,* 391 N.W.2d at 250. In determining whether the offenses are products of a single or continuing motive, "we have found it helpful to consider factors such as intent, modus operandi, and the temporal and geographic proximity of the crimes." *State v. Oetken,* 613 N.W.2d 679, 688 (Iowa 2000). In *Lam,* we held there was sufficient evidence that the offenses charged were parts of a common scheme or plan to burglarize apartments. We found it was relevant that the burglaries took place on the same day, in the same general location, and using the same method of transportation. In *Oetken,* there was sufficient evidence of a common scheme or plan with a single continuing motive when the burglaries were committed on two consecutive days, using similar methods.

In this case, the crimes took place within a twenty-four-hour period. The objectives were similar—to obtain money and/or cigarettes. The same method of transportation was used, and the businesses targeted were in the

same general location. Hajtic's defense was the same in all the cases—he was acting under intimidation by Eric Miller, his accomplice.

We conclude the trial court did not abuse its discretion in consolidating the trials.

## VI. *The Ineffective Assistance of Counsel Issue.*

Hajtic argues that his counsel was ineffective because he failed to produce expert testimony on the inherent weaknesses in eyewitness testimony and on Hajtic's mental state. The record on this appeal is insufficient to assess these claims, and they are therefore preserved for possible postconviction relief proceedings.

**AFFIRMED.**

All justices concur except Hecht, J., who takes no part.