# IN THE COURT OF APPEALS OF IOWA

No. 19-1810
Filed July 21, 2021

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ADAM GOLDEN MCCAIN,**
    Defendant-Appellant.

_____


Appeal from the Iowa District Court for Lee (South) County, Mary Ann Brown, Judge.


Adam Golden McCain appeals his conviction for murder in the first degree. **AFFIRMED.**


Martha J. Lucey, State Appellate Defender, and Vidhya K. Reddy, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Darrell Mullins, Assistant Attorney General, for appellee.


Heard by Bower, C.J., and Tabor and Ahlers, JJ.

**AHLERS, Judge.**

This case calls for us to decide when and under what circumstances law enforcement officers can reinitiate questioning of a suspect after the suspect has invoked the suspect's right to remain silent.

Shortly after 10:00 p.m. in Keokuk on February 5, 2019, a passerby found a woman lying face down on the sidewalk near a business establishment. There was a trail of blood leading to the woman, who was crying and calling for help. The woman managed to tell the passerby that she had been stabbed by Adam McCain.

Around the same time police and medical personnel were being dispatched to help the stabbing victim, law enforcement dispatch received a call that a white car struck some parked cars and had not stopped. Law enforcement officers began looking for the vehicle. A Lee County deputy sheriff came across a white car and its male driver stopped along a road outside of Keokuk. The car was disabled from front-end damage and a flat tire that had been driven down to the rim. The male driver was identified as Adam McCain. While the deputy was talking to McCain about the hit-and-run, the deputy received word from dispatch that the man he was investigating for the hit-and-run may be the suspect in the stabbing incident. The deputy placed McCain in handcuffs, told him he was being detained, and began questioning him. After a few questions, McCain said, "I plead the fifth." The deputy then asked a few more investigatory questions before stopping the interrogation. McCain was taken to jail.

In the meantime, it was determined the stabbing victim had died and that she was the mother of McCain's child. The Iowa Division of Criminal Investigations (DCI) was contacted to help with the investigation. Law enforcement officers

obtained a search warrant for McCain's body and clothing to look for evidence related to the stabbing. Around seven hours after McCain was taken into custody, a DCI agent and an officer with the Keokuk Police Department arrived at the jail to execute the search warrant. Jail staff awakened McCain, who had been asleep for about five hours, so the officers could execute the search warrant.

While the search warrant was being executed, McCain began asking questions of the officers. The officers told him they would be willing to talk to McCain and answer any questions he may have, but they would need to complete their work on the search warrant first. After the officers finished executing the search warrant, they asked McCain if he wanted to talk. This led to McCain agreeing to talk, the giving of *Miranda*[1] warnings, and an interrogation of McCain that resulted in McCain confessing to stabbing the victim and then crushing her against a bolted down trash can with his car before leaving the scene. McCain was also allowed to make phone calls to relatives, during which McCain admitted murdering the victim. It is this interrogation at the jail and the statements made during subsequent phone calls to family members that create the issues on appeal.

McCain was eventually charged with murder in the first degree[2] and was found guilty of that offense following a bench trial. He appeals.

## I.      Issues Presented

McCain raises several issues related to the admission of his statements to officers while being questioned at the jail and the statements to family members

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).
[2] *See* Iowa Code §§ 707.1, 707.2(1)(a) (2019).

on the phone while in jail.[3]  In particular, McCain asserts: (1) the statements to officers during questioning at the jail were obtained in violation of his right to remain silent under the United States Constitution and Iowa Constitution because (a) officers did not scrupulously honor his invocation of his right to remain silent and (b) McCain did not voluntarily waive his rights; (2) a claimed waiver of the right to remain silent under the United States Constitution and the Iowa Constitution after the suspect has invoked the right should have to be proved objectively by a written waiver by the suspect or a video recording showing the waiver; and (3) suppression should extend to the statements McCain made to relatives on the phone as fruit of the poisonous tree.

## II.     Standard of Review

> We review a district court's refusal to suppress statements allegedly made in violation of constitutional guarantees de novo. *State v. Ortiz*, 766 N.W.2d 244, 249 (Iowa 2009); *State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001).  Under this standard of review, we make "'an independent evaluation of the totality of the circumstances as shown by the entire record.'"  *Turner*, 630 N.W.2d at 606 (quoting *State v. Howard*, 509 N.W.2d 764, 767 (Iowa 1993)). "We give deference to the district court's fact findings due to its opportunity to assess the credibility of witnesses, but we are not bound by those findings."  *Id.*  We consider both the evidence introduced at the suppression hearing as well as the evidence introduced at trial.  *State v. Countryman*, 572 N.W.2d 553, 557 (Iowa 1997).

*State v. Palmer*, 791 N.W.2d 840, 844 (Iowa 2010).

---

[3] Via a pretrial motion to suppress, McCain sought to suppress his statements to the deputy on the side of the road, his statements to officers while being questioned at the jail, and his statements to family members on the phone while at the jail. The parties stipulated to suppression of the roadside statements.  The district court denied McCain's motion regarding the other statements.

## III. Discussion

We address each issue separately.

### A. Right to Remain Silent

We begin by discussing McCain's right to remain silent under the United States Constitution.

#### 1. United States Constitution

Under the Fifth and Fourteenth Amendments to the United States Constitution, authorities are required to advise suspects of their *Miranda* rights before beginning a custodial interrogation. *Palmer*, 791 N.W.2d at 844. The State concedes, and we agree, that McCain was in custody and subjected to interrogation during the interview at the jail during which McCain made the challenged statements, so *Miranda* applies. The *Miranda* warnings inform the suspect of the suspect's Fifth Amendment rights to remain silent and to have counsel present during questioning. *Id.* Statements made during a custodial interrogation are inadmissible unless adequate *Miranda* warnings have been given and the suspect validly waived the suspect's rights. *Id.* at 844–45. For a suspect to waive those rights, the waiver must be given knowingly, intelligently, and voluntarily. *Id.* at 845. The burden is on the State to prove: (1) the suspect knowingly and intelligently waived the right by showing the waiver was made with a full awareness of the right and the consequences of the decision to abandon it; and (2) the suspect voluntarily waived the right by showing the waiver was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

### a. Scrupulously Honoring Invocation

*Miranda* also requires a second level of procedural safeguards before questioning can be resumed after a suspect invokes the suspect's Fifth Amendment privilege to remain silent. *Id.*; *Michigan v. Mosley*, 423 U.S. 96, 103–04 (1975). In that situation, a resumption of questioning is permissible only when the suspect's right to cut off questioning has been "scrupulously honored." *Palmer*, 791 N.W.2d at 846. To determine whether the suspect's right to cut off questioning has been scrupulously honored, we look at the totality of the circumstances and consider the factors set forth in *Mosley*: (1) whether law enforcement officers immediately ceased the interrogation after the right to remain silent was invoked; (2) whether questioning was resumed "only after the passage of a significant period of time"; (3) whether law enforcement officers provided the suspect with a fresh set of *Miranda* warnings; and (4) whether a new law enforcement officer, in another location, "restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." *Id.*

Here, while arguments can be made that McCain's roadside invocation of his Fifth Amendment rights was limited to an isolated question, we find McCain's statement, "I plead the Fifth, sir," to be an unequivocal invocation of his right to remain silent in general. *See Simmons v. Bowersox*, 235 F.3d 1124, 1131 (8th Cir. 2001) (holding that, for a suspect to invoke the suspect's right, the suspect must "unequivocally express his desire to remain silent"); *but cf. United States v. Reynolds*, 743 F. Supp. 2d 1087, 1090 (D.S.D. 2010) (holding suspect's statement, "I plead the Fifth on that," was an expression of selective invocation of his right to remain silent that only applied to the specific question); *State v. Wright*, 537

N.W.2d 134, 137–38 (Wis. Ct. App. 1995) (holding invocation of right to remain silent only applied to a specific question when the suspect stated he would "plead the Fifth on that one" in response to the question). As a result, law enforcement needed to scrupulously honor McCain's right to remain silent before resuming questioning. We analyze the *Mosley* factors to determine whether that occurred. *See Palmer*, 791 N.W.2d at 846.

The first *Mosley* factor somewhat favors McCain. After McCain invoked his right to remain silent on the roadside, the deputy did not immediately cease questioning. We also note that the deputy did not give McCain *Miranda* warnings at any time during the roadside custodial interrogation. These facts favor a finding that McCain's right to remain silent was not scrupulously honored. This finding is tempered slightly by the fact that the questioning following the invocation lasted only twenty-five seconds and consisted of four questions: "Were you hurt?", "Was there an altercation?", "Were you traveling alone?", and "Did you meet up with anybody?" While these questions should not have been asked due to the lack of *Miranda* warnings and McCain's invocation of his right to remain silent, this is not a situation in which the deputy wore McCain down with prolonged questioning. *See State v. Willingham*, 933 N.W.2d 619, 628–30 (S.D. 2019) (finding invocation of right to remain silent was scrupulously honored even though officers briefly engaged in questioning designed to elicit an incriminating response after the invocation but before subsequent resumption of questioning).

The second *Mosley* factor favors the State. After the brief questioning following McCain's invocation of his right to remain silent, McCain was not questioned or otherwise faced with conduct designed to elicit incriminating

statements for about seven hours. During that seven-hour period, McCain was left alone to sleep for around five hours before he was awakened to execute the search warrant. This significant passage of time favors a finding of scrupulously honoring McCain's rights. *See, e.g.*, *Mosley*, 423 U.S. at 104 (finding right to remain silent was scrupulously honored when suspect was not questioned for over two hours after invocation of his right); *Brown v. Caspari*, 186 F.3d 1011, 1015 (8th Cir. 1999) (finding three-hour interval significant).

Third, McCain was given a full reading of the *Miranda* warnings before being questioned at the jail. The full reading took place after McCain was repeatedly told he did not have to answer any questions if he did not want to do so. This factor favors the State.

Fourth, different officers conducted the second interrogation in a different location. While the questioning during the second interrogation focused on the same crime as the first interrogation,[4] this is not fatal to a finding that McCain's rights were not scrupulously honored. "[A] second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview." *Willingham*, 933 N.W.2d at 629 (quoting *United States v. DeMarce*, 564 F.3d 989, 994 (8th Cir. 2009)); *see also Palmer*, 791 N.W.2d at 849 (finding the fact the second interview was conducted by the same officer as

---

[4] At the suppression hearing, the State argued that the questioning on the roadside related to the hit-and-run investigation while the questioning at the jail related to the stabbing. On appeal, the State concedes "[i]t is not necessary to quarrel whether [the roadside questioning] related only to the hit-and-run," which we interpret as a concession that the questioning in both instances centered on the stabbing. Even without the concession, we find the roadside questioning related primarily, if not exclusively, to the stabbing investigation and not the hit-and-run.

the first is not dispositive). "This is especially so when there is no showing that the police conducted the subsequent interview 'to induce [the defendant] to abandon his earlier assertion of his right to remain silent.'" *Willingham*, 933 N.W.2d at 629 (alteration in original) (quoting *Brown*, 186 F.3d at 1015). Here, there is no showing the interview at the jail was conducted to induce McCain to abandon his earlier invocation. In fact, McCain initiated the conversation that led to the second interview. We are not naïve enough to suggest that the DCI agent and the police officer executing the search warrant did not want or hope for the opportunity to interview McCain, but the fact remains McCain repeatedly started conversations with those two officers, not the other way around. When questioned by McCain about the investigation, the officers declined to engage in questioning, informing McCain that they were there to execute the warrant but offering to talk later if McCain desired. After completing execution of the search warrant, the officers then offered to answer McCain's questions and talk to him. In doing so, the officers gave McCain the choice of rooms, although stating a preference for the room McCain ultimately selected. The officers also repeatedly reminded McCain that he did not have to answer any questions he did not want to answer. In response, McCain said, "Let's go talk." At that point, they went to the room chosen by McCain, and a full *Miranda* warning was given followed by McCain answering questions with no hesitation.

In considering the *Mosley* factors, no single factor is dispositive and we look at the totality of the circumstances. *See Palmer*, 791 N.W.2d at 849. While there are some facts favoring a finding McCain's right to remain silent was not scrupulously honored, we find the totality of the circumstances show that his right

was so honored. As a result, we reject McCain's claim that his *Miranda* rights under the Fifth Amendment were violated by law enforcement conducting a second interview after McCain invoked his right to remain silent.

### b. Voluntariness of Waiver

We also reject McCain's claim that his waiver of his rights was not voluntary. In support of his argument on this issue, McCain relies heavily on his claim that his invocation of his right to remain silent was not scrupulously honored. As we have found McCain's right to remain silent was scrupulously honored, we reject this part of McCain's argument. Even so, we also address his independent claim that his waiver of his right to remain silent was not voluntary.

As previously noted, the burden is on the State to prove a knowing, intelligent, and voluntary waiver of McCain's rights by showing (1) the waiver was made with full awareness of the right and the consequences of the decision to abandon it and (2) the waiver was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *See Palmer*, 791 N.W.2d at 845. (quoting *Moran*, 475 U.S. at 421). To make those determinations, we look at the totality of the circumstances surrounding the interrogation. *Id.*

McCain highlights the fact the officers conducting the interview at the jail did not capture McCain's waiver on video or in writing. He also points out that even the audio recording of the interview did not include a verbal waiver. Instead, the State relied on the testimony of both officers that McCain nodded his head in response to the questions related to whether he wanted to waive his rights and speak with them. While these facts support McCain's argument, they do not

persuade us that his waiver was involuntary after considering the totality of the circumstances.

As noted, McCain started a discussion about the homicide investigation. The officers declined to engage in a conversation while they continued to execute the search warrant. After completing the execution of the search warrant, the officers returned to the topic of McCain speaking with them. In doing so, the officers repeatedly reminded McCain that he did not have to answer any questions and gave him the choice of rooms for the questioning to take place, although implying a preference for the room eventually chosen. When asked if he still wanted to talk to them, McCain said, "Let's go talk."[5] The three then went to the

---

[5] The exchange at issue went as follows:

> DCI Agent: Do you want to step over to the other room and then we can kind of get into that other stuff?
>
> McCain: Um— (pause)
>
> DCI Agent: Here's the deal, man. If you don't want to answer a question that I ask you, you have that right. You don't have to answer anything at all. You don't have to say anything to us. Nothing. Alright? That's completely up to you. But I walked in, I looked at you, I could tell you had one—like I said, one heck of an evening. All we're here to do is to kind of figure out what in the world is going on, touch bases with you, and kind of see what—go from there. If I ask you a question you don't want to answer, you certainly don't have to do that. It's a hundred percent your right. If you want to talk, we can go over there, we can chat. I can stay—we can stand right here and talk. If you don't want to, you can stop it at any time—
>
> McCain: We can go in what room?
>
> DCI Agent: Just the room across the hallway. Yeah.
>
> Unidentified Voice: Just so you can sit down.
>
> DCI Agent: So you're not standing up in front of us and stuff.
>
> McCain: What kind of a penalty does a homicide charge carry?
>
> DCI Agent: That's stuff that we can get into, we can talk about later, but I've got a few things that I have to go over first, before I can get into that.
>
> McCain: Let's go talk.
>
> DCI Agent: Alright.

room selected by McCain, the door was closed, and a full *Miranda* warning was given. After the warning was given, the following exchange occurred:

> DCI Agent: Do you understand each of those rights as I've explained them to you?
> McCain: (No audible response)
> DCI Agent: Are you willing to talk to us?
> McCain: (No audible response)
> DCI Agent: Okay.

The DCI agent then proceeded with questions, which McCain answered without hesitation. While no audible response was given by McCain, both officers present testified that McCain nodded his head "yes" in response to the questions. The district court found this testimony credible, as do we on our de novo review. The flow of the conversation is consistent with McCain having nodded agreement to the questions and inconsistent with any claim that McCain responded in a negative way or not at all. As a result, we find McCain expressed agreement to the questions asked and voluntarily participated in the interview.

Along with the fact McCain expressed consent to the interview after having been given *Miranda* warnings, we note there was no intimidation, coercion, or deception to gain McCain's waiver of his rights. Again, the opening of the door that led to the second interview occurred because McCain began asking questions about the investigation. As a result, we find no intimidation, coercion, or deception at that stage. Once the officers began talking to McCain, the conversation involved no aggression, flaunting of authority, or demanding language or conduct. The officers spoke to McCain in a civil and pleasant tone, made no demands as to where the questioning would take place, and repeatedly noted McCain's right not

to answer any questions. Nothing about the interaction between the officers and McCain could be characterized as intimidating, coercive, or deceptive.

Based on our de novo review of the totality of the circumstances resulting in McCain's submission to the second interview, we find McCain waived his rights knowingly, intelligently, and voluntarily. Therefore, we find no violation of McCain's rights under the United States Constitution.

### 2. Iowa Constitution

In support of his claim that his right to remain silent was violated, McCain argues that, if no relief is afforded under the United States Constitution, relief should be granted under the Iowa Constitution. McCain asserts the Iowa Constitution should be interpreted to provide "more protective standards and/or more stringent application of federal standards." While McCain points out that our supreme court has declined to find the Iowa Constitution provides less protection against self-incrimination than the Fifth Amendment, *see State v. Heard*, 934 N.W.2d 433, 440 n.3 (Iowa 2019), he cites no persuasive authority supporting his claim the Iowa Constitution provides more protection.[6] He also provides no suggestion as to what those greater protections should be. With no cited authority and no suggested standard, we decline McCain's invitation to interpret article I,

---

[6] Not only is there no persuasive authority supporting McCain's claim the Iowa Constitution provides more protection than the United States Constitution, there is authority for the proposition that the Iowa Constitution does not contain a privilege against self-incrimination at all. *See State v. Kilby*, ___ N.W.2d ___, 2021 WL 2483566, at *10 (Iowa 2021) (McDonald, J., concurring specially) ("The Iowa Constitution, unlike the Federal Constitution, does not contain a privilege against self-incrimination."); *State v. Gibbs*, 941 N.W.2d 888, 907–10 (Iowa 2020) (McDonald, J., concurring specially).

section 9 of the Iowa Constitution to provide greater protection against self-incrimination than the Fifth Amendment.

## B. Requiring Objective Proof of Waiver

McCain asserts we should impose a requirement on law enforcement officers to provide objective proof of a post-invocation waiver of rights by recording it in writing or on video. However, McCain acknowledges that our supreme court declined to impose such an obligation. *See State v. Madsen*, 813 N.W.2d 714, 721–22 (Iowa 2012) (encouraging electronic recording of noncustodial interrogations but declining to adopt a per se rule requiring it); *State v. Hajtic*, 724 N.W.2d 449, 455 (Iowa 2006) (encouraging but not requiring videotaping of custodial interrogations). We find *Madsen* and *Hajtic* to be controlling supreme court precedent, which we are not free to overrule. *See State v. Beck*, 854 N.W.2d 56, 64 (Iowa Ct. App. 2014) ("We are not at liberty to overrule controlling supreme court precedent."). As controlling precedent declines to impose the requirement to prove waiver by written or video-recorded means, we reject McCain's request to adopt such a requirement.

As a fallback position on this issue, McCain asserts the failure to provide written or video-recorded proof of McCain's waiver of his right to remain silent should weigh heavily against a law enforcement officer's claim of waiver in assessing the totality of the circumstances. We have considered that failure, but we have also considered other circumstances. Those circumstances include McCain's response, "Let's go talk," after being informed he did not have to answer any questions. Those circumstances also include the fact the interview was audio-recorded. While it would have been better if the officers had asked McCain to

confirm his head nod in response to their waiver questions by requesting an audible response, the recording still corroborates the officers' testimony. Judging by both the officers' and McCain's responses to the questions about waiver and the investigative questions that followed, it is clear McCain acknowledged that he understood his rights and still desired to answer the officers' questions despite the fact he did not give audible responses to the waiver questions. Based on the totality of the circumstances, we find adequate proof of McCain's waiver of his right to remain silent.

### C. Statements to Relatives—Fruit of the Poisonous Tree

McCain also seeks to suppress the statements he made to relatives on the telephone after the second interview. While McCain does not identify the specific statements he seeks to suppress, he presumably seeks to suppress incriminating statements to his uncle[7] and his grandmother.[8] McCain asserts these statements must be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 487–488 (1963) (holding evidence is "fruit of the poisonous tree" and thus inadmissible when the evidence is obtained by exploitation of illegally obtained evidence).

McCain's claim fails for at least two reasons. First, a combination of lack of error preservation and waiver precludes us from addressing it. Both in his motion to suppress and at the suppression hearing on the motion, McCain's position was

---

[7] During his phone call with his uncle, McCain stated, "I lost it and I fuckin' murdered [the stabbing victim]," and "I just fuckin' lost my shit and fuckin' stabbed her and ran her over. I couldn't deal with the fuckin' pain anymore."

[8] As he was saying goodbye to his grandmother at the end of their phone call, McCain said, "Yeah, but I killed that bitch though, so . . . ."

that the statements he made to his relatives were obtained in violation of his rights under Iowa Code section 804.20,[9] not that they were the fruit of the claimed improper interrogation. On appeal, McCain has abandoned any claim based on a violation of Iowa Code section 804.20. Instead, he asserts the phone statements were fruit of the improperly obtained admissions in violation of his constitutional right to remain silent.

We cannot address the violation of section 804.20 urged at the district court because McCain has not asserted the issue on appeal and has therefore waived it. *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."). We cannot address the fruit-of-the-poisonous-tree issue urged on appeal because McCain did not assert the issue to the district court. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). As a result, we reject McCain's claim on error-preservation grounds.

---

[9] Iowa Code section 804.20 states:

> Any peace officer or other person having custody of any person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of the person's family or an attorney of the person's choice, or both. Such person shall be permitted to make a reasonable number of telephone calls as may be required to secure an attorney. If a call is made, it shall be made in the presence of the person having custody of the one arrested or restrained. If such person is intoxicated, or a person under eighteen years of age, the call may be made by the person having custody. An attorney shall be permitted to see and consult confidentially with such person alone and in private at the jail or other place of custody without unreasonable delay. A violation of this section shall constitute a simple misdemeanor.

Second, even if we sidestep the error-preservation problem, McCain's claim that his statements to his relatives were fruit of the poisonous tree fails because the tree was not poisonous. McCain's claim presumes that his confession to law enforcement was obtained in violation of his constitutional right to remain silent and, once the cat was out of the bag by his unlawfully obtained confession to law enforcement, he had no incentive to refrain from making further confessions to relatives. However, as we have explained, McCain's confession to law enforcement was not obtained in violation of his right to remain silent, so the premise of McCain's fruit-of-the-poisonous-tree claim is faulty. As the confession to law enforcement was not improperly obtained, even if the confession contributed to McCain's later confessions to relatives, there was no impropriety that warrants suppression of the statements to the relatives.

## IV.    Conclusion

For the foregoing reasons, we conclude the district court properly denied McCain's motion seeking to suppress his statements to law enforcement officers and relatives. We affirm McCain's conviction of murder in the first degree.

**AFFIRMED.**